FILED

10/23/2025

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2025 Session

## STATE OF TENNESSEE v. GAVIN ALLEN CLARK

**Appeal from the Circuit Court for Coffee County**
**No. 2020-CR-46,811F      Robert Thomas Carter, Judge**

_____

### No. M2023-01427-CCA-R3-CD
_____

A Coffee County Grand Jury indicted the Defendant, Gavin Allen Clark, with first-degree felony murder by aggravated child abuse (count one), first-degree felony murder by child neglect (count two), aggravated child abuse (count three), and aggravated child neglect (count four). Following a jury trial, the Defendant was convicted of the lesser-included offense of reckless homicide in counts one and two, and he was convicted as charged in counts three and four of aggravated child abuse and aggravated child neglect. He received an effective sentence of twenty-three years in confinement. In this appeal as of right, the Defendant raises the following issues for review: (1) as an issue of first impression in Tennessee, whether the verdict is defective for ambiguity because within each count the jury simultaneously convicted and acquitted; (2) whether the trial court erred in failing to act or serve as the thirteenth juror; (3) whether the evidence was sufficient to sustain his conviction of aggravated child neglect; (4) whether the trial court erred in deciding the McDaniel motions when the trial judge employed an erroneous legal standard and conducted an arbitrary hearing; (5) whether the trial court erred in permitting witnesses to testify about the Defendant's callous demeanor; (6) whether the trial court erred in denying the motion to suppress data from the Defendant's cell phone; (7) whether the State engaged in prosecutorial misconduct in closing argument; (8) whether the State violated the Defendant's speedy trial rights; and (9) whether the cumulative effect of the errors requires reversal.[1] Upon review, we conclude that the verdicts returned by the jury in this case were ambiguous because they purport to simultaneously convict and acquit the Defendant. As such, the verdicts are unenforceable and cannot be given full effect. Under the circumstances of this case, we also conclude that the Defendant's convictions are not barred from retrial based on double jeopardy principles, and we remand for a new trial. We further conclude that the trial court failed to fulfill its duty as the thirteenth juror, which also mandates reversal of the Defendant's convictions, and remand for a new trial. We address the Defendant's remaining issues in the event of further appellate review.

---

[1] We have reordered the Defendant's issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed, Vacated and Remanded for New Trial.**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JEFFREY USMAN, Sp. J., joined, and TIMOTHY L. EASTER, J., joining in part and dissenting in part.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Gavin Allen Clark.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Craig Northcott, District Attorney General; and Jason Ponder and Jennifer Craighead, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The facts giving rise to the instant case stem from the death of the Defendant's five-week-old son, who suffered from severe brain injury as a result of five separate skull fractures while in the exclusive care, custody, and control of the Defendant. The cause of the victim's death was determined to be blunt force trauma to the victim's skull associated with child abuse, and the manner of the victim's death was described as "beaten by [an] assailant." The Defendant alleged that while holding the victim in his right arm, he tripped on a toy, fell down a set of stairs, and dropped the victim. The Defendant did not immediately observe any external symptoms of injury to the victim, and he did not seek medical treatment for the victim until nearly five hours after the fall. On January 5, 2020, the Defendant was arrested for the first-degree murder of the victim. On July 14, 2020, the Coffee County Grand Jury indicted the Defendant with first-degree felony murder by aggravated child abuse (count one); first-degree felony murder by aggravated child neglect (count two); aggravated child abuse under eight (8) years of age (count three); and aggravated child neglect (count four).

The Defendant's five-day trial commenced on September 19, 2022, and concluded on September 23, 2022. The proof adduced at the Defendant's trial consisted of the following testimony and exhibits. Before testimony, two exhibits were stipulated to and admitted into evidence: (1) a video showing the victim's parents entering Walmart to get their taxes done on the morning of the offense; and (2) the victim's medical records from Vanderbilt University Medical Center ("VUMC") and Tennova Medical Center.

Mother, the victim's mother and the Defendant's wife, testified that the victim was born on November 25, 2019, and passed away when he was "just shy of six weeks old." A photograph of the victim was entered into evidence. Mother returned to work three weeks

after the victim was born, and the Defendant did not have a job at the time. On January 3, 2020, the night before the victim's death, Mother noticed "something [was] wrong with [the victim's] penis" when she got home from work. It appeared red, irritated, and swollen. Mother asked the Defendant what happened, and he said he did not know. They decided that if the swelling had not gone down in the morning, they would take the victim to the doctor about it the next day. When she awoke the next morning around 5:15, the Defendant was already awake, walking around the house, and had the victim up and awake. Asked why he had the victim awake, the Defendant told her that he did not want to wake her and that he had changed the victim's diaper and fed him. When she left the house that morning for work, the victim appeared "normal." She said he had an older bruise on his forehead from his three-year-old older brother. She agreed the victim's penis was "still a problem."

The Defendant and Mother discussed which of them would take the victim to the doctor. Mother told the Defendant that she was willing to miss work, but he told her that he would take the victim to the doctor. When Mother suggested that she would go with the Defendant, he complained that she never let him take the victim to the doctor. Mother relented, and the Defendant later dropped her off at work. Mother subsequently called the Defendant and told him that he needed to take the victim to "Urgent Care" because she could not get through to their doctor's office. Her timecard from work on January 4 was admitted as an exhibit and reflected that she clocked in at 6:45 a.m. and clocked out at 11:00 a.m.

When the Defendant picked up Mother from work, they did not go to Urgent Care as planned. Mother testified that the Defendant told her that he had already taken the victim to see a doctor. The Defendant also told her they "needed to start making sure that the kids kept their toys in their room." When Mother asked him to explain, the Defendant told her that their older three-year-old son's toy was on the stairs, and that the Defendant and the victim fell. The Defendant did not describe the fall to her. When Mother asked if the victim was okay, the Defendant told her that the victim was fine and that he had eaten. Asked if the Defendant fell with the victim before or after he had taken him to see the doctor, the Defendant initially told her they fell after he had taken the victim to the doctor. The Defendant changed his mind "two seconds later," and told her he had taken the victim to the doctor after they fell down the stairs. The Defendant told Mother the doctor said the victim "looked fine." They proceeded to Walmart to file their taxes. When they drove to Walmart, the victim was in the backseat of the car, asleep. Mother was not concerned with the victim because the Defendant said he was okay.

Mother testified that they were at Walmart for roughly forty-five minutes and returned home. Mother took the victim's car seat out of the car and placed it on the couch inside their home. When she took the victim out of the car seat, she observed that he could not "fully get that yawn and stretch out. It looked like there was something wrong with his

mouth." She told the Defendant that something was not right, and they needed to go to the hospital. They went to Tennova Hospital. She did not recall seeing the Defendant again until the victim was being placed into a helicopter. She explained that, at some point, the Defendant had taken their three-year-old son to his parents' home. She remembered sending the Defendant a text message stating that "it doesn't look good that you're not here[.]" She said the victim was taken by LifeFlight to Vanderbilt Children's Hospital, where he was admitted to the intensive care unit for pediatrics. She and the Defendant took turns staying with the victim and alternated taking smoke breaks outside while he was there. She said the next morning, January 5, the victim passed away.

On cross-examination, Mother denied that the Defendant text messaged her that the police barred him from coming back to where they were at the hospital. She said the Defendant told her the hospital was on "lockdown" and there was no mention of police. She understood the Defendant to mean that he could not get inside the hospital. She agreed that she was married to the Defendant and denied living with another man and having a boyfriend at the time of trial. She could not recall whether she had previously testified that the doctor's visit, which the Defendant told her about in the car, referenced treatment for the victim's penis or treatment for the fall. After defense counsel played an audio recording presumably of her prior testimony, Mother stated that she was not sure whether the Defendant "supposedly took the kid to the doctor for the fall or for the penis." She agreed that if the Defendant was released, she did not plan to live with him.

Mother agreed that the victim had a medical device in his head to drain the pressure when she arrived at the hospital. She agreed that the stairs on which the Defendant fell were carpeted. She agreed the victim had a carpet burn on his nose, and he appeared to have "skinned his nose on the carpet." She agreed the victim had an older bruise above his right eye. She agreed that the victim's older three-year-old brother would commonly leave his toys "all over the place," including the stairs. She agreed that she could not tell from looking at the victim that he had a skull fracture and needed emergency medical care. She denied that the Defendant told her that he had not taken the victim to the hospital when he picked her up from work. She had never observed the Defendant abuse their children. She agreed that the Defendant worked a few days a week every couple of weeks prior to the victim's death. She agreed that the Defendant served as their family caretaker, and she had no issue with him watching their children.

On redirect examination, Mother said the Defendant told her that they fell down the stairs "on the way to come get [her]" from work. She said the fall occurred when they were leaving the house to come and get her. She said the Defendant and the children left the house a couple of times to get her that morning. She received a text message at 9:46 a.m. from the Defendant stating, "About to head that way. We are about to be released." Asked what he was being released from, Mother said, "I assume the doctors." She maintained

- 4 -

that she did not know that they had fallen down the stairs until the Defendant got into the car and told her. On recross examination, she agreed that there was not enough time for the Defendant to have gone to the doctor if the fall had occurred when they were leaving the house to pick her up from work.

Katrina Hill, a charge nurse at the Tennova Hospital emergency room, testified that another nurse had notified her when the victim arrived. She immediately requested assistance from other doctors and nurses and called a "Code Pink." Code Pink was similar to a Code Blue for adults, which meant CPR in progress, or in the case of a "super critical patient." She said the victim was bruised and his skull was deformed. A heart monitor showed the victim's heart rate was within normal range. A needle was placed directly into his bones in order to provide medication quickly. The nursing staff also attempted to warm the victim with as many blankets as possible. They also performed a chest X-ray; however, their primary concern was getting the victim to Nashville for a higher level of care. After speaking with Mother, Hill was told that earlier in the day, the Defendant was going down the stairs with the victim and fell with the victim. Mother told her the Defendant tripped over a toy, and at another point, Mother said that the Defendant said he "just tripped."

While Hill did not recall speaking to the Defendant, she did observe the Defendant's behavior. When asked how he was acting, defense counsel objected, noting that his demeanor was not relevant. The trial court responded, "You can ask how he was acting." She then stated that the Defendant did not react. She said, "He didn't show emotion. He had a very blank stare. I personally did not ever see him shed a tear." Asked how Mother was acting, she said, "Hysterical." She testified that Dr. Scott Giles had their unit secretary call the communication center as part of their protocol. She stated, "Any time you suspect abuse or neglect, it doesn't matter the age, you are to report it. We are legally required to." She took several photographs of the victim in the hospital, which were admitted into evidence. One of the photographs reflected blood coming out of the victim's nose and bruising. She said that the victim's posture was not normal and was a sign of brain injury. One of the things she immediately noticed was that the victim's eyes were bulging out and swollen.

On cross-examination, Hill agreed that everyone handles grief differently. She agreed that the medical records showed the victim's family was at his bedside, but she denied charting that information. She also agreed that another individual charted that the victim did not have any open wounds. She agreed that the photographs did not show blood coming out of the victim's nose, but she affirmed that it was there. She agreed they may have wiped it away. Asked to show on the photograph where she observed the victim's skull was physically deformed, she said the photographs "can't depict everything that you can see." She continued to explain that "shadows change" and the victim's skull was "shifted strangely." Asked if a person could see with their naked eye a deformed skull in

any of the photographs, Hill said, "It depends on how you view things.  Depends if they have ever seen a deformed skull."  She agreed that no head X-rays were ever taken.  She agreed that the notation in the medical records that the victim's pupils were reactive to light was usually a positive sign.

On redirect examination, Hill was asked about a notation in the medical records that the victim's parents were at his bedside at 3:19 p.m.  Hill read, "Prior to departure Mother and Father were given the opportunity to see the baby and kiss the baby[,]" and defense counsel objected because the notation was about the Defendant's demeanor.  The State noted that the question was in response to defense counsel asking Hill on cross-examination about the family being at the bedside.  The trial court permitted the testimony and noted, "This is responsive to defense counsel's question."  Hill continued and read the following excerpt from the medical records, "Mother approached and while crying she kissed the infant.  She appears very distraught and has been throughout the time the infant has been here.  The father reluctantly approached the infant and kissed the child on the forehead.  He was not crying at that time."  On recross examination, upon being asked if someone could be upset and not cry, Hill said, "Everyone reacts to things differently."

Chet Mason, a Tennessee Bureau of Investigation (TBI) expert in digital forensics, analyzed the Defendant's cellphone, extracted data, and prepared a report of his examination, which was admitted as an exhibit.  He testified that when the Defendant's phone was first submitted to the TBI two years prior to trial, he was unable to extract any data.  Upon the second submission, technology had advanced such that they were able to obtain information from the phone.  He found "cookies" on the day of the homicide on the Defendant's phone.  This indicated that either "the actual website of that cookie was visited, or the possibility of a search engine was used and whatever term was searched, the website—it returned the websites as a possibility of what term was searched."  He also obtained data that had been marked for deletion by the Defendant.

On cross-examination, upon being asked whether he could determine if anything "relevant" had been deleted from the Defendant's phone, Mason agreed that the extraction and Cellebrite report showed that "someone deleted every single text message off of this phone before they gave it to police[.]"  He agreed that he was unable to determine whether the Defendant had deleted the text messages.  He agreed that the "cookies" showed that the Defendant may have visited websites such as healthline.com and infantCPR.com.  However, he was unable to determine if the Defendant actually visited the websites.  He agreed that nothing in the Defendant's website history had been deleted.  He agreed that the Defendant began searching the internet for medical information at 8:32 a.m., and another search occurred at 8:56 a.m.  He also recovered text messages between the Defendant and Mother from the day of the incident.  Upon being asked to read the text messages the Defendant sent to his wife at 5:29 p.m. and 7:03 p.m., Mason read, "I'm as

sorry as I could ever be. I promise I am. I feel terrible. That's my son that I'm supposed to love and protect[,] and I let him down now." He also read, "What's going on back there? I'm not the bad guy. Why did they leave me behind? This is really messing with me on the inside."

On redirect examination, Mason explained that a gap in the internet search history could mean that (1) there was no web browsing during that time, (2) his tool did not recover it, or (3) it was deleted and not recovered by his tool. Since there were cookies present on the Defendant's phone, this indicated there was browsing activity and his tool was working properly. Because there was no web history recovered, Mason opined that the information had been deleted and not recovered. A redacted timeline of the extraction report was admitted into evidence, and Mason confirmed that a cookie from healthline.com was generated on the Defendant's phone at 2:09:27 a.m. and 8:32 a.m. on the morning of the offense.

Jennifer Brooke Hamilton, the nursing supervisor at Tennova Hospital when the victim was brought to the emergency room, testified that she remembered the victim was not responsive when they tried to "thump a foot, rub his chest." They had been told that the victim had been at home with a parent and had fallen down the stairs. She said it was not uncommon for the emergency room staff to assess "a toddler f[a]ll off a swing set or mom accidentally dropped a baby[.]" She said they "quickly" observed that the injuries to the victim were more serious than what they initially thought after their initial assessment. She noted on the victim's chart that "Mother states [victim] was at home with father while she was at work. Father states that he tripped over an older sibling[']s toy and fell down the stairs while holding the infant at approximately 11:00 a.m." While at the victim's bedside, she observed blood in his mouth and charted it on his medical record. She was present when the victim was taken by LifeFlight to VUMC and observed the victim's mother at his bedside while the Defendant was in the hallway. Over defense objection, she said the victim's mother was crying; however, the Defendant was not. She continued and stated that the mother was "very emotional, very engaged," but described the Defendant as "reserved[.]" She understood that everyone processes these things differently, but she agreed that his response was not "typical" of what she sees in similar situations.

On cross-examination, Hamilton assumed the blood in the victim's mouth came from his injuries. She did not know whether the injury was from a "minor cut" on the inside of the victim's lip because she was not present. Other than a mark to the victim's forehead, she did not observe any open wounds to the victim's body. She observed dried blood in the victim's mouth, ears, and nose. Asked whether, when a toddler falls off a swing or when a mother drops a baby and brings them into the hospital, if an X-ray is performed "in every single one of those cases," she said she would if there was "reasonable suspicion" to do so. Ultimately, however, whether to conduct an X-ray of the child is to

be determined by a physician. Asked if she observed any skull fractures to the victim's head, she said she "can't observe without looking at an X-ray."

Jessica Pratt, a nurse practitioner, was on duty at the hospital when the victim came into the emergency room. She said the victim "came in with his mom and dad, just lifeless, no crying." She observed his head seemed "misshapen" and his eyes seemed swollen. She did not initially treat the victim but recalled his vital signs and that he was cold and his temperature was low. Asked about any communication she had with the victim's parents, she said the victim's mother was "very distraught" and the Defendant was "relatively stoic, just not a lot of communication from him, I didn't feel like." She said the Defendant was with another child and left the hospital with that child for a brief period of time. She said the Defendant returned to the hospital. She said when the helicopter arrived, the victim's mother was "clearly upset," and while the Defendant did join in "the goodbye," she described him as "just emotionless for the goodbye." On cross-examination, she was shown exhibits two and nine, photographs of the victim's head, and asked to identify on exhibit nine where the victim's head "was somehow warped." She replied, "I felt the baby's eyes were swollen, and I would agree they still look swollen in this picture." She also insisted that the victim's head "looked misshapen[]."

Investigator Jamie Norris of the Manchester Police Department received a 911 dispatch concerning alleged child abuse and responded to the Defendant's home in Manchester at 2:50 p.m. on the afternoon of the offense. Upon arrival, no one was present at the home, and Investigator Norris had been advised that LifeFlight was taking the victim to VUMC. When the victim's parents arrived home, Investigator Norris described the victim's mother as "devasted," and the Defendant as "very forthcoming with information," "not sad," and physically, not crying. Investigator Norris took various photographs of the Defendant's home, which were admitted into evidence. The first photograph showed the home from the perspective of the front door, including the couch, television, and kitchen with closets and stairs to the left. The next photograph was of a toy truck and a toy dinosaur lying on the floor in the living room. The next photograph was of the master bedroom and an unmade bed. The next photograph was of the Defendant explaining to the investigators where the fall occurred and walking them through what happened. Investigator Norris acknowledged that the photograph was not of the entire staircase and that it did not contain any toys on the stairs. Investigator Norris said the Defendant did not provide "a particular step. He couldn't say it was exactly the fourth step down. He just gave a ballpark eight, nine, ten step." Investigator Norris demonstrated for the jury how the Defendant described the fall:

> He showed us that he grabbed ahold of the right rail and fell like such [indicating]. He did not tumble. He did not fall to his knees, did not fall to his rear end, did not roll down the stairs as this picture -- as he was showing

us. He just showed that his right hand grabbed ahold of it and that's when he said that [the victim] fell out of his hands or out of his arms and rolled down the stairs.

Investigator Norris said the Defendant told them that he fell to his knees, but the Defendant did not show them how he did so when asked to describe it to the investigators. Investigator Norris described another photograph from the top landing of the stairs with a green tractor at the bottom of the stairs. Investigator Norris said it was in that location when they arrived at the home. No toys were picked up or moved upon their arrival or while they were there. He described another photograph showing two marks on the stairwell wall of the home. He said the apartment building in which the Defendant lived was recently built. Another photograph depicted a yellow Tonka crane or heavy-duty truck, which the Defendant told investigators was the toy he had fallen over. Investigator Norris said the Tonka truck was found in the victim's older brother's room, which was upstairs. The Tonka truck was taken into evidence at a later date and admitted as an exhibit at trial. Another photograph showed the trash can, which contained some baby wipes with blood on them. Investigator Norris said that when he asked the Defendant about the bloody baby wipes, the Defendant told him that the victim had "busted his lip" and the blood on the wipes was from the Defendant cleaning the victim's mouth. Another photograph was of the Defendant to determine if he had any injuries consistent with a fall. Investigator Norris said he did not document any injuries to the Defendant at that time.

Investigator Norris said that the Defendant told him the victim cried "a little" and "threw up" after he fell. The Defendant cleaned the victim and placed the victim next to him on the couch. After the Defendant left the home to go to VUMC, the investigators drove to the hospital to continue their investigation. After speaking with the doctors and viewing the victim, the investigators interviewed Mother. They Mirandized the Defendant and interviewed him again. The Defendant provided a signed, written statement (performed at his home), which was admitted into evidence. The Defendant's handwritten statement provided as follows:

> I got a couple of steps down I was talking to my oldest son who was in the living room and as I took my step I stepped on a toy truck I believe and it rolled and tripped me as I fell my son came lo[o]se from my hands as I leand [sic] toward the left to try to grab the rail to catch our fall but before I could do that or catch us both my son broke loose from me and fell towards the baseboard and proceeded to fall down the stairs I picked him up he cried for a short time and threw up a little after I cleaned him I fed him he ate a small amount and coverd [sic] him up and he laid beside me until I went to get my wife from work 2 ½ maybe 3 hrs max in between the fall and getting my wife I didn't take him emeditly [sic] because I hope he got better.

Investigator Norris confirmed that the Defendant stated he leaned toward the left to try to grab the rail and catch their fall; however, as shown in the photograph, the rail was on the Defendant's right. Investigator Norris believed the Defendant was "maybe missing his words." The Defendant also said he had the victim in his left arm; however, the photograph showed the Defendant would have fallen to his right. Investigator Norris consulted with the district attorney and arrested the Defendant on January 5, 2020. The victim passed away at 6:38 that morning, and an autopsy took place on January 6, 2020. Investigator Norris attended the autopsy and obtained a search warrant for the Defendant's home on January 9, 2020. No one was living at the house at the time of the search warrant. Handwritten drawings and blueprints of the Defendant's home were admitted into evidence. The exhibits showed the length of the handrail of the staircase measured 14 feet 8 inches, from top to bottom, the length of the handrail from where the alleged fall took place. The stairs were numbered and measured 3 feet 2 inches wide and had a 7-inch drop by 11-inch platform from the stairs themselves.

Investigator Norris confirmed that, upon being asked how the victim got the bruise on his head, the Defendant told him that a week before the victim died, the Defendant made a pallet for the victim outside on the concrete ground where the Defendant sat outside and smoked a cigarette. While the victim was on the pallet, the Defendant said the victim "rolled over and fell[.]" Investigator Norris was concerned with this statement because, based on his experience, a five-week-old child could not roll over on their own in a blanket. Investigator Norris explained that he took another photograph showing a view from the landing underneath the thirteen stairs to show that there were no hard surfaces or non-carpeted surfaces. He agreed that the Defendant lived in a newer apartment complex with newer carpet. He repeated that the Defendant told him he was on approximately "the eighth to tenth step, eight through ninth step" when he fell. This meant the Defendant was on the fourth or fifth step from the top of the fourteen stairs. A photograph was shown depicting the padding underneath the carpeted stairs, which was cut, and a sample was sent to the TBI for blood analysis and testing.

While at the Defendant's home during the search warrant, they also conducted a reenactment of the fall using a doll in the place of the victim. Investigator Norris said the Defendant told him that he was carrying the victim on his left arm, with his back and head resting against his chest, and his feet dangling over his arm while walking down the stairs. Two video clips of the reenactment were admitted into evidence. The victim's mother assisted investigators in retrieving the Defendant's phone, which was obtained from the side of the road near the Defendant's biological mother's home. Investigator Norris identified the Defendant's phone, which had a cracked screen and was muddy. He said it was the same phone that was sent to the TBI twice for analysis. The Defendant's phone was admitted into evidence as an exhibit.

The phone logs from the Defendant's phone showed that on January 4, 2020, the day of the offense, at 2:09 a.m., there was a search for healthline.com. At 8:32 in the morning, there is a Bing search for infantCPR.com, at 8:40 a.m. topregisterednurse.com, and at 8:41 a.m. healthline.com. There were several text messages between the Defendant and Mother during the morning of offense, which corroborated Mother's chronology of how the events occurred that morning.

The parties stipulated to phone calls the Defendant made from the Coffee County Jail. As part of his investigation, Investigator Norris monitored the Defendant's phone calls from jail. In one recording the Defendant commented on "fist hits" and said he did not tell Investigator Norris anything about that in his statement. In another recording, the Defendant said something about marks behind the victim's ears, which he omitted from his statement to Investigator Norris. Investigator Norris agreed that the Defendant told him the victim was sleeping; however, the Defendant said in the jail phone calls that he would not let the victim go to sleep.

On cross-examination, Investigator Norris did not recall whether the Defendant told him that the victim was sleeping "off and on" and that the Defendant tried to stop the victim from sleeping. He agreed that the victim's injury would have likely occurred around 8:30 that morning, and the Defendant told him that the injury had happened either at 9:00 that morning, or two and a half to three hours before he picked up his wife. He agreed that the Defendant never stated that he purposefully injured the victim. He agreed the Defendant did not specify what the victim hit or where he landed after the fall. He agreed that the doll used in the reenactment was a different weight than an actual human baby and that he did not trip or fall on a toy. He denied that the baseboard was a sharp surface and explained that it was compressed wood. He nevertheless agreed that the baseboard was harder than the carpet. He agreed that while the Defendant was providing his statement, the Defendant was at the bottom of the stairs, and from his perspective, the railing would have been on his left. He denied that the Defendant directed him to the bloody wipes in the trash can, but he agreed that there was not a large amount of blood on the wipes. He agreed that the Defendant told him that the victim's older three-year-old brother previously had struck the victim in the head with a toy fire truck. He agreed that he did not take a close-up photograph of the Defendant's knees, and he denied, upon being shown a photograph zooming in on the same, that the Defendant's knees appeared irritated or skinned up from the carpet. He agreed that the autopsy report referred to the cause of death as "beaten by assailant."

On redirect examination, Investigator Norris testified that the yellow Tonka truck had been picked up and placed in the victim's older brother's room. He said the Defendant "walked us upstairs and pointed out the yellow truck that he alleged[ly] fell over and that

was in" the room. He said the Defendant did not tell him why he picked up the toy and not the others that were lying on the floor.

The State later recalled Investigator Norris to testify that a laboratory technician was unavailable due to family medical leave. Consequently, Investigator Norris was asked to conduct a Bluestar preemptive test, which was a type of spray put on a surface to determine if the surface contained blood or bodily fluids. Investigator Norris conducted a Bluestar test on the carpet recovered from the four stairs that "the Defendant alleged [sic] fall down and where the baby alleged fall and was bleeding, those four steps were removed and tested." The test did not reveal the existence of blood or anything that could be construed as blood. On cross-examination, Investigator Norris said the carpet was tested for blood based on the bloody baby wipes in the trash can and the Defendant's statement that he cleaned up the victim. While he did not test the baseboard for blood, he visually confirmed that blood was not present on the baseboard at the time.

Brandon Tomberlin, the Chief Investigator of the Manchester Police Department, assisted in the investigation of the victim's death and testified consistently with the testimony of Investigator Norris. He also said when the bloody baby wipes were found in the trash can, the Defendant said he used them to clean blood from the victim's mouth after the fall. In regard to the Defendant's statement that was taken while he was at the hospital, Chief Tomberlin said the Defendant additionally told them that he was supposed to take the victim to the doctor that morning for an injury the victim already had, but he did not do that. On cross-examination, Chief Tomberlin testified the Defendant told him that there were three possible incidents which would explain the victim's injuries: (1) that the day before the fall he noticed an injury to the victim's penis and knew that it needed medical attention; (2) that one day before the fall, "a toy was rolled into" the victim; and (3) that four or five days before the fall he built a padded blanket on the exterior carport concrete for the victim to set on or lay on and the victim rolled off of the padded blanket. Chief Tomberlin agreed that he could have reversed the timeframe of when these events occurred.

Dr. Scott Giles, an expert in the field of emergency medicine, testified that he was the medical examiner for Wilson County. He testified that the victim was brought to Tennova Hospital around 2:00 p.m. on the day of the injury and appeared "clearly severely injured." He testified, "the fact that there was a delay from the injury to treatment time has always been taught to us as a red flag for neglect or abuse, so that was a primary concern." The appropriate law enforcement authorities were contacted, and medical personnel did their best to stabilize the victim for transport to VUMC. Based on the medical records, the victim was admitted to the hospital at 1:24 that afternoon. Based on his understanding of the Defendant's account the injury occurred about 11 o'clock, and there was a two-and-a-half-hour approximate delay from injury to treatment. He briefly spoke with the Defendant about what happened, and the Defendant told him he had tripped downstairs and dropped

the victim. He described the Defendant's demeanor as "pretty calm" and atypical. He described the demeanor of Mother as "very, very concerned." He further stated that at the time the victim was taken by LifeFlight, the victim's mother "hovered over the child, kissed the child. The father [Defendant] was somewhat reluctant to even kiss the child at the time when we loaded him on the helicopter."

Dr. Giles testified that he decided to get the victim to a trauma center as quickly as possible. He did not take X-rays or scans because there was "really nothing to be gained," and he believed it would delay treatment for another thirty minutes. Asked how he concluded that the victim was in severe distress, he testified that the victim was not responding to any stimulus. He said the victim's heart rate dropped and his pupils became unresponsive. He observed minor external injuries to the victim's body including bruising to the scalp, frontal and left side of the head, and abrasive non-threatening injuries to the penis. He agreed he conducted an X-ray for blunt chest trauma, which was part of a skeletal survey and did not require the victim to leave the emergency department. He also agreed that the victim did not suffer from either rib fractures or previously inflicted rib fractures. He agreed that the victim may have initially responded to pain; however, when a drill was placed into his tibia the victim did not respond. He agreed that the victim's skull was not "warped looking."

The voir dire of Dr. Kristina Betters consisted of the following testimony. Dr. Betters testified that she obtained her undergraduate and medical degrees from the University of Florida. She attended Emory University where she completed three years of pediatric residency and three years of pediatric critical care training. She was an assistant professor of pediatrics in the pediatric critical care department at Vanderbilt University for over five years. As part of her tenure as a professor, eighty percent of her time is dedicated to the pediatric intensive care unit (ICU) and twenty percent to research. She is a member of the Society of Critical Care Medicine, the American Academy of Pediatrics, and is the co-chair of the ICU Liberation Committee. She had publications in clinical research studies with a focus on the rehabilitation of pediatric critical care patients. Her curriculum vitae was admitted into evidence without objection.

On cross-examination, Dr. Betters agreed that she planned to testify in this case regarding her opinion of whether the victim was abused and neglected. She stated the victim had "inflicted trauma." She could not specifically say how the trauma was inflicted. However, she testified "the clinical finding on this child w[as] consistent with somebody intentionally harming him." When asked why she made this conclusion, she said "because they [the injuries] are not consistent with an accidental injury." She continued to support her conclusion by stating the nature of where the fractures occurred, the nature of where the bruising was, and the injuries that occurred supported her conclusion of child abuse. She agreed she was not aware that the victim exhibited bruising unrelated to the alleged

- 13 -

fall. Asked what the location of the fractures revealed, she stated the mechanism of injury predicts where fractures would occur and where they would not occur. She said she considered the reported injury versus what you actually see on a patient. She said the reported injury was the child being held while the father was walking down the stairs and that he tripped over a toy, that they were carpeted stairs, and that the child fell out of his arms. If a child had fallen from their parents' arms onto carpeted stairs, she would have expected a singular point of contact with the child's skull that could cause a fracture. She disagreed that, in the instant case, a single point of impact could cause multiple fractures.

Dr. Betters explained that if a child fell from their parents' arms onto carpeted stairs, if the child was going to have a fracture, she would expect it to happen on that first impact, and then rolling down carpeted stairs, she would not expect subsequent fractures based on impact. She agreed she was not advised of the possibility that the victim struck anything other than carpet. Asked whether the victim struck a wooden baseboard along the edge of the carpet or possibly the wall itself would change her opinion, she said it would depend on the distance between the victim and the object the child struck, and the degree of force involved. She was unfamiliar with the experiments of W. Weber concerning skull fractures in infants. She stated her opinion was based on the entire clinical picture of the case including irritation of the victim's penis. She was not given any information that the victim's penis injury was from a pre-existing condition. She also noted the findings of the head CT and the increased intracranial pressures. She denied that anyone who damaged their brain would have increased intracranial pressure. She disagreed that the increased intracranial pressure was because of the bleeding in the victim's brain and explained,

> I think it was probably a combination. It was a combination of bleeding in the brain and then subsequently, through delay of care, the child probably had decreased blood flow to the brain tissue, and that caused injury to the brain cells and [caused] swelling. This child had diffuse cerebral edema also noted on their CT scan, so I think the increased pressures in the brain were multi-factorial.

When asked what could have prevented that, she said seeking medical care early after the injury. Specifically, she said an "EVD" or external ventricular drain could have drained off cerebrospinal fluid from inside the brain to reduce pressure. Although the victim's mother testified that the victim had an EVD, Dr. Betters clarified that the victim's swelling in his brain was so severe that the neurosurgeons were only able to place an intracranial pressure monitor in the victim. She could not testify with certainty as to what symptoms the victim would have displayed shortly after the incident. However, with this level of injury, she expected the victim would have exhibited symptoms immediately including reduced interaction, sleepiness, and lethargy. She denied disagreement in the scientific community about whether the presence of multiple fractures proves an inflicted

- 14 -

injury. She explained "you can't use just fracture pattern to determine those things. We take the whole patient's clinical picture into account when we are determining whether injuries are inflicted." She also denied this was a subjective analysis. She was unfamiliar with a study by Lance and Kucher in 2011 concerning fatal intracranial injury caused by a stairway fall, and she had not been provided with Dr. John Hunsaker's report. She could not provide a "potential rate of error in concluding that this was an abusive injury." She denied that there was no clear methodology to child abuse determinations and supported her opinion with her experience and training in the field.

Dr. Betters had not treated patients with falls from their parents' arms on carpeted stairs in ICU before. She agreed, "babies that fall out of the highchairs and hit their head on one single part that have one single fracture, but to have multiple fractures in multiple parts of your skull, that would require multiple impacts or a much higher level of injury." She denied the victim's fractures in this case were centered in the vertex of his skull. She said the fractures occurred on both sides of the parietal skull, so the bleeding was around the vertex, but the fractures were on both sides of the skull. There was also a frontal fracture on the victim. She denied that the fractures formed a circle around the bleeding. She explained that the fractures were not consistent with a single impact because they were too spread out. Although she reviewed the CT scan, she did not measure the distance between the fractures. She agreed that a child's skull may be compressed upon impact at the vertex; however, she denied that it would produce multiple fractures.

On redirect examination, Dr. Betters agreed that her practice and training is generally accepted in the scientific community throughout the United States. On recross-examination, she explained that child abuse training is part of all general pediatrics and pediatric critical care. After the voir dire examination, the trial court overruled defense counsel's motion and found Dr. Betters competent to testify as an expert "principally because of her academic credentials, because of her clinical training and experience." The court allowed Dr. Betters to testify that in her opinion, "the injuries presented to the victim were non-accidental and that the explanation given for the injuries [did] not comport with injuries that she has seen in her education, training, and clinical experience[.]"

Dr. Betters's trial testimony was consistent with her testimony during voir dire regarding her professional background, training, and opinion concerning the victim's injuries. In addition, she testified that she was the initial treating physician for the victim in the pediatric intensive care unit (PICU) at VUMC. The victim was transferred to the PICU from the emergency room. The emergency room staff did CT scans of his body and head and laboratory work in preparation for treatment in her unit. She observed notable bruising and abrasions or scratch marks on the victim's body. Her initial concerns were his brain pressures were highly elevated. The CAT scans of the victim's head revealed "several skull fractures on different sides of his head. It showed … subdural hemorrhages,

which are bleeding in his brain, some scattered areas, and then head findings that were very – finding that showed that his brain was swelling."

Dr. Betters explained that the victim had right and left parietal skull fractures and a frontal bone fracture. The victim did not have an epidural or subarachnoid bleeding. However, he did have subdural hemorrhages, which was indicative of "[a] significant traumatic injury since there [were] multiple." Although there were multiple small ones all over, the most pronounced bleeding was toward the top of the victim's head. The neurology team placed a pressure monitor on the victim. She said the pressure on the victim's brain was so high, it was pushed up against his skull. She said the pressure monitor showed the victim's initial pressure was 65, and a normal pressure reading is less than 20. The victim had herniation in the brain or pressure so high that parts of the brain were being pushed into the middle and base of his skull. She said the neurosurgeons were unable to provide further aid to the victim because his whole brain was swollen, and they could not drain off the fluid from his brain. She "would not have expected" the victim's injury to have occurred as a result of a blunt force to the top or one side of the head.

By the time the victim arrived to the PICU, he had "pretty severe brain damage" and there was nothing surgically to be done. She was shown a series of previously admitted photographs of the victim at the hospital. She said the injury to the victim's penis would not have been caused by circumcision and appeared to have been inflicted upon the victim. She identified a bruise on the right side of the victim's skull in another photograph. She would not expect that type of bruise to occur by a sibling who may have pushed a Hot Wheels car or truck into the victim's head. She explained that the amount of force needed to cause that type of bruise on an infant's scalp would be higher than that caused by a child's toy. She said the victim had bruising "almost like an abrasion" with early scabbing on the tip of his nose. She said he had bleeding on his nose, lips, and a bruise underneath his eye.

Dr. Betters was advised that the Defendant was holding the victim going down carpeted stairs and tripped on a toy, and the victim fell out of his arms. She said the story was "never consistent" and she would have expected the victim to have a singular point of impact from that "first big fall, and then rolling on carpeted stairs . . . that is not as high impact, even if he would have rolled as much . . . the penis injury still didn't make sense, how that injury would have occurred with that injury." Upon being shown a photograph, she described a bruise of his ear lobe on the left side, which was not consistent with carpet burn from rolling down the stairs. She also identified a darker bruise above the victim's eye, but she acknowledged that it was difficult to "stage bruising."

She discussed her treatment of infant/toddler patients who had skull fractures. Asked to consider if the medical history disclosed one initial impact with some type of

surface resulting in one fracture, she said many of those patients do not need ICU level care. They do not have internal brain bleeding, and after overnight observation, they are typically permitted to leave the hospital the next day.

Based on the above findings and observations, Dr. Betters' diagnosis of the victim was "inflicted trauma." Based on her training and medical history, her diagnosis of the victim's inflicted trauma was child abuse. Asked if the delay in treatment of several hours after the incident was alleged to have occurred contributed to the victim's death, Dr. Betters said,

> Yes, because by the time [the victim] got to us, his brain swelling was so severe that it was already pushing his brain down into places it shouldn't be and causing damage. His pupils, the black part of his eyes, weren't even reactive to light anymore, and that means that the pressure was so high that it had injured the nerves of his eyes already, so his swelling was so sever, and whenever you have brain swelling from bleeding and it gets severe, it pushes the blood out of your brain, so he wasn't getting good blood flow to his brain tissues, and it was causing more damage, so time is really important with an injury like this.

Asked again, "so every minute, second – I know you can't say if he would have been there immediately, but it did contribute, correct?" She stated, "Yes, and the neurosurgeons, if the liquid-filled parts of his brain would have been open enough, they could have put a drain in one of those spaces, and then we could have drained off some of the liquid to help with the brain pressures, but everything was too swollen for us to do that." Asked next, so if he would have gotten there earlier, that would have been an option? Dr. Betters said, "It may have been an option."

On cross-examination, Dr. Betters stated she was unaware of any grant funding VUMC received from the Department of Children's Services ("DCS") to fund child abuse studies. She said she consulted with the child abuse team in forming her opinion; however, because the victim died so quickly, they never observed the victim in person. Regardless, she said the child abuse team had no bearing on her diagnosis. She agreed that the victim's irritated penis was part of her child abuse diagnosis and that she was not told that it was a pre-existing injury from the night before. She agreed that she did not have a degree in physics and could not state the amount of force necessary to cause carpet burn on the victim's nose and ear. She made those findings based on her clinical experience; however, she had not conducted any testing to verify her findings. She disagreed that the victim's injuries to his nose, under his left eye, and on his ear were on "almost the same plane[.]"

- 17 -

Dr. Betters agreed the mechanism of force she was provided in this case was carpeted stairs and not a baseboard. She agreed the baseboard was a harder surface than the carpet. After being asked about compression of the skull, she stated that in her clinical experience she had not seen a single point of skull compression causing multiple fractures on different sides of the skull. She agreed that she was not familiar with W. Weber's 1984 study on infant cadavers and single and bilateral fractures, explaining that it was not within her nature of research. She agreed however that if a skull is impacted on its vertex, as in this case, the skull would be pushed down or compressed. She did not agree that compression would cause multiple fractures bilaterally. She denied that every time she encountered multiple skull fractures, she labeled it abuse. She agreed that she spoke only to Mother to obtain the family history, and she did not speak with the Defendant. She agreed that if a child fell down a set of stairs, the child should be presented for medical care; however, she denied that a child who had fallen downstairs would exhibit the type of injuries the victim suffered in the instant case.

On redirect examination, Dr. Betters agreed that vomiting and sleeping for a long time after a fall were signs that an infant needed to be taken to a hospital. She was not told after the victim's fall in this case that the Defendant lied to the mother and told her that he had taken the infant to the hospital. Even if the victim had struck his head on the baseboard at the end of the stairs, this would not have changed her opinion and diagnosis of child abuse and inflicted trauma.

The voir dire of Dr. Deborah Lowen consisted of the following testimony. Dr. Lowen received her undergraduate degree from Duke University, and her medical degree from Wake Forest University. She completed a residency in pediatrics in Denver at the Children's Hospital, and a two-year fellowship in child abuse pediatrics at Hasbro Children's Hospital affiliated with Brown University. Since 1997, she had been working full-time in the field of child abuse pediatrics at several different centers in New Jersey, Oklahoma, and Tennessee. At the time of the trial, she worked at DCS as a Deputy Commissioner of Child Health. Prior to working at DCS, she worked at Vanderbilt Children's Hospital for ten years. She testified that she was board-certified in general pediatrics and child abuse pediatrics through the American Board of Pediatrics. She was also on the board that certifies child abuse pediatricians, having served two years as the board chair and then as editor of the board. At the time of the offense, she was an associate professor of pediatrics and ran the child abuse team at VUMC. Based on this information, the State offered Dr. Lowen as an expert in the field of pediatric medicine and a board-certified child abuse pediatrician.

The Defendant objected and argued that the State "should be required to bear the burden of proof and be a little more specific about what opinions they plan to introduce." The court advised defense counsel that it anticipated the expert was going to express certain

opinions and if defense counsel wanted to test those opinions, defense counsel should ask her what they are going to be. Defense counsel proceeded to ask Dr. Lowen what her opinions were "in terms of whether this child was abused and/or neglected[.]" In response, Dr. Lowen stated, "My opinion is that this child, [the victim] . . . was a victim of child abuse that led to his death." Asked what her methodology was to determine that the victim was abused, Dr. Lowen stated,

> The same methodology I look at for every child when I don't have the opportunity to evaluate them in person, so I do a detailed chart review. I look at the medical records, look at everything documented, look at what the injuries were, how they were detected. In this case, there was an autopsy, so I reviewed the autopsy. I reviewed the autopsy photos. I needed further -- when I first got involved in this case, I needed further information before I could come with an opinion, a medical opinion --

Dr. Lowen said she needed to know more specific details about the fall down the stairs and contacted the prosecutor before she could make a conclusion. She was told that the Defendant had tripped on a toy while walking down the stairs while carrying the baby, and the baby then fell. She needed to know if the father fell with or directly on the child. Upon receiving the information, she opined that the child did not suffer his fatal injuries from falling on the stairs in the manner that was described. This is because there were too many injuries to too many different parts of his head, and the injuries were too severe from anything seen in a typical childhood fall, even a baby being dropped on the stairs. She agreed there were "atypical" falls; however, she denied that even an atypical fall would have caused the victim's injuries without falling directly onto the victim's head. She based her opinion on medical literature and her experience. Asked for specific literature, she said there were "stair fall articles" and thousands of articles about how to evaluate a child with head injuries and injuries indicative of child abuse. Asked, if she was saying since something is more commonly done with abuse than an accident permits her to so testify, she replied, "No. You look at the totality of the information, the history of how something happened, how it was presented, what the injuries are, the details of the specific injuries, and the outcome, and you put it all together. . . . I'm saying this child in this circumstance, the totality and severity of his injuries were unbelievably outside anything that would ever be expected from any stair fall."

Although she agreed that a child could die from a stair fall, she opined "[B]ecause of the specifics of his injuries, the multiple skull fractures on multiple different planes of his head, the amount of bruising of the scalp, the amount of bruising on the face, the torn frenulum, the severity of his brain injury is all far in excess of a falling down the stairs." Asked if she would agree that a plausible mechanism of getting multiple skull fractures for the skull to suffer a blow on the vertex can produce fractures basically all around the vertex,

she replied, "No. That's a mischaracterization of the medical literature. You can get bilateral skull fractures from one blow right on the vertex, but they are often very symmetric. They are linear on the sides, and it is a very, very different situation than what this baby had." Defense counsel continued to question Dr. Lowen about some of her conclusions in her report, which Dr. Lowen explained to defense counsel that he had misunderstood. Asked to provide specific literature to support her conclusion, Dr. Lowen stated "Joffe and Ludwig" and "Geobellow." She also noted that there were "thousands of articles and multiple textbooks about injuries related to abuse, and what differentiates accidental injuries from abusive injuries. She cited the "2018 summary statement by Chaudhary," as her most recent article. She agreed she did not have a degree in physics. Asked her "logic behind why a baby cannot get multiple fractures from landing on a hard object, from falling from being held by his father" she replied,

> You can get -- again, if all the baby had was two skull fractures -- two linear skull fractures, one on each side of the head, and fell and hit his head and that's all that baby had, maybe a small subdural, I would say okay, but that's not all that this baby had. This baby had multiple fractures, I think two different ones on one side, another one on another side, and one in the front, that doesn't make any sense physiologically or, you know, just common sense that that happened from one central impact, nor would one central impact cause the severity of brain swelling that caused this baby to die.

Asked generally "why," Dr. Lowen said, "Because it doesn't happen." Over the State's objection that defense counsel had gone beyond the scope of the hearing, defense counsel continued to ask Dr. Lowen about the circumstances of the fall. At this point, the trial court interrupted, agreed with the State, and sustained the objection. The trial court then confirmed that Dr. Lowen was brought in as a consultant the day after the victim had died, she reviewed the autopsy at a later point in time, she reviewed the victim's chart notes, and that this was a common methodology that was generally accepted in the scientific community in determining child abuse cases. Dr. Lowen could not provide a "rate of error" but she knew of no case in which she thought a child had been abused and "good evidence" later revealed they were not abused. On recross examination, she agreed "there are a handful of people" who do not accept child abuse opinions and rely instead on "unique causal theories." She denied that her methodology and medical conclusion were subjective. Under the standards set forth in McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997), the trial court found Dr. Lowen qualified as an expert witness to give an opinion that the victim's injuries were not accidentally caused or evidence of child abuse.

Dr. Lowen testified consistently with her testimony from the above hearing concerning her professional education and medical background. Although she was not at the hospital when the victim passed away, she reviewed his chart the next day. She was

asked by the assistant district attorney to review the victim's case in more detail a few weeks later. She said the injury that killed the victim was severe brain swelling, which led to his death. She said, while there are lots of reasons a baby can present with severe brain swelling, the victim also had subdural hemorrhage, hematoma, bleeding on the top of the brain between the brain and the skull. She said he had "multiple, multiple, multiple" skull fractures. The victim had a linear fracture in the right frontal bone, and a fracture in the left and right parietal bone and several other fractures. The victim had a tear in his upper frenulum (the area between lips and upper gum) and multiple bruises about his face and scalp. An infant is not capable of causing the frenulum injury to himself, and Dr. Lowen opined the victim's injury was a classic sign of abuse. It was indicative of someone either forcing something into the victim's mouth or someone "popped" the victim in the upper lip, and it tore.

Dr. Lowen explained that the victim's bruising was extensive. She said that small or pre-existing bruising a week or two prior to the offense was a "red flag" because a six-week-old does not have the strength to cause such bruising on their own. She said the victim had multiple bruises on multiple different planes about the face and scalp, which was indicative of "a lot of points of impact." She acknowledged the bruising on the victim's penis was present the day before the victim died; however, she said this type of bruising was never normal in a six-week-old baby. She said the bruising to the victim's penis should have merited concern and cause to call child welfare for an investigation.

In obtaining the victim's history, she asked investigators if the father fell onto the baby's head because she was concerned this may have been a "crush-type" injury. She was advised that the father did not fall onto the victim's head. Her opinion and diagnosis of the cause of the victim's death was "not from an accidental fall down stairs, that he was a victim of child abuse, and that led to his death." She clarified, "I'm not saying he didn't fall down stairs. He might have fallen down stairs, but that is not what caused these injuries and is not what caused his death." She described a stair fall for the jury as follows:

> [O]ne good fall from an arm or something or in a walking child, it could be a decent fall of several feet, and then a series of very little falls as a child or baby rolls down or tumbles down the rest of the stairs . . . if you fall 8 inches, 6 or 8 inches . . . there's not much force generated in that, and so you almost never get injuries from those little tiny falls, so if you get an injury, it's from that first fall.

She was given a sample of the carpet padding taken from the stairs from the Defendant's home and opined that an infant who had fallen down carpeted stairs with that type of padding would not have suffered a skull fracture. Asked to consider the Defendant's theory that the victim had struck his head on the molding from the initial fall,

- 21 -

Dr. Lowen said that would not account for the multiplicity of fractures on different surfaces or the multiplicity of bruises on different surfaces. Her opinion in this case was within a reasonable degree of medical certainty. Dr. Lowen explained her understanding of this phrase as meaning, "there is no reasonable alternative explanation, and if you had to give a percentage, I use like 98, 99 percent certainty, with a caveat that I'm not 100 percent sure of anything." Dr. Lowen's curriculum vitae was admitted into evidence. Dr. Lowen was asked if anything "jump[ed] out" to her in the report of Dr. John Hunsaker, a defense witness, and defense counsel objected as beyond the scope of her testimony because Dr. Lowen was not a forensic pathologist.

On cross-examination, Dr. Lowen agreed that she was part of the child abuse team at Vanderbilt, but she denied that she personally received any grant funding. She was aware of a case report documenting cases of children dying from falling or being dropped down stairs; however, she questioned the veracity of the report. She reiterated that bruising on the victim's penis was indicative of someone getting frustrated because the child was peeing during a diaper change and pinched his penis. She maintained that the victim's penis was bruised, not inflamed and characterized it as "external trauma to the penis." She was unaware of reports that the victim's penis was "swollen" from the night before his death. She agreed that when she initially reviewed the victim's case an autopsy had not been conducted. She was unaware that the large bruise above the victim's right eye had been reported as a pre-existing injury because it was not included in the medical record. She agreed this was not a part of her diagnosis/opinion. She was aware that the Defendant had reported to police that the victim fell toward "the baseboard." She agreed this information was not included in her report. She agreed that an infant falling from three or four feet onto a hard surface and hitting his head can suffer a bilateral fracture. She explained that a child suffering from a single impact fall on a hard surface may suffer no more than two linear skull fractures on each side, which should be nearly symmetric, not complex or branching, and not on the frontal bone.

She was familiar with the 1984 W.Weber study involving children's bodies being dropped and measuring skull fractures upon hitting a hard surface from less than three feet; however, she believed the study was "incredibly flawed and not able to be compared with real life infants." She was familiar with another article from the *Journal of Injury and Violence, The Infant with Bilateral Skull Fractures, Diagnostic Considerations in Consultation with a Child Abuse Pediatrician* by Mandy O'Hara. She agreed that it was "possible" that one fall could produce bilateral skull fractures. However, she said this was "very different" than the injury suffered by the victim. Asked if the victim's fractures "generally surround the vertex of the skull," she said, "No, they do not." She explained they were on the side on the parietal bone. She agreed that she reviewed the victim's CT scan. She again denied that two of the victim's fractures were a result of him striking the baseboard. She further elaborated:

[A] fall directly on the vertex could cause a fracture on each side of the skull. I don't know how a baby being dropped from being carried can strike the baseboard on the side right directly on the vertex. That is one problem. The other problem is the location and appearance of any of the skull fractures, well, except for maybe one, would not match up with the report -- the case reports in the literature about bilateral skull fractures coming from one impact on the vertex.

She insisted the fractures in this case were "absolutely not possible" from a stair fall and striking a baseboard. She agreed that if an infant were dropped down a flight of stairs it may or may not be necessary to have the infant evaluated.

On redirect examination, Dr. Lowen emphasized that a single drop of a child can cause a bilateral fracture to the parietal bones. She again explained to the jury how there could be fractures that are bilateral if the child hit the vertex of their skull. She reiterated that if an infant struck the vertex, the infant should not get a fracture of the temporal parietal area. She said the victim had a fracture higher up on the left side which was a complex fracture with multiple branches which signified a higher degree of force. She said the victim suffered bruising of the scalp near the fracture, which meant it was not from a bending from a blow to the crown or vertex that caused the bilateral skull fractures. She said the bruising of the victim's penis was not a complication of circumcision because the victim was circumcised weeks prior to his death.

On recross examination, Dr. Lowen agreed that it was difficult to see the temporal fractures on the radiology report. She said the autopsy report referenced the "Linear fractures are noted on the right frontal bone, left parietal bone, right parietal bone, and left temporal parietal." She explained that the autopsy report referred to the temporal fractures as "[n]on-depressed linear left parietal bone fracture extends to the squamosal suture," which is where the temporal bone is. She said this may have contributed to the confusion by the defense.

The following testimony was adduced during voir dire of Dr. Jessica Turnbull. Dr. Turnbull completed a residency in pediatrics at the Children's Hospital and Medical Center of Akron, Ohio, and was the chief resident for a year. She completed a three-year pediatric critical care fellowship at Seattle Children's Hospital, a two-year fellowship in pediatric clinical ethics, and obtained her master's in ethics from the University of Washington. At the time of trial, she served as an attending physician in the medical-surgical pediatric intensive care unit and the clinical ethicist for VUMC. She explained that clinical ethics involves clinical situations "where there is no one right answer, and that can lead to a lot of distress about what the morally right thing is to do, so clinical ethics is this Venn diagram

of medicine and law and philosophy and religion[.]" She is a member of a three-person team that consults at the children's hospital and adult hospital at VUMC. She is board certified in general pediatrics and pediatric critical care in Tennessee. She also teaches other students about pediatrics and pediatric critical care, and clinical ethics. She has been exclusively in the area of pediatric critical care at Vanderbilt since 2013. As part of her training in critical care pediatrics, she was trained in the detection and diagnosis of non-accidental trauma. She testified that learning to diagnose and care for children who have been abused or undergone non-accidental trauma is part of a general pediatrics education. She previously had been qualified in criminal court to testify as an expert in pediatric critical care four times in the last year and three or four times since 2013.

On cross-examination, Dr. Turnbull stated she planned to testify regarding her assessment that she "cared for [the victim] due to acute respiratory failure secondary to the sequelae of traumatic brain injury associated with child abuse." Asked the science upon which she was relying to determine the victim's injury was associated with child abuse, Dr. Turnbull stated, "The injuries that [the victim] presented are what we call pathognomonic for child abuse, and so the injuries that [the victim] had have presented in so many one-month-old babies with histories such as his that we actually teach medical students to diagnose child abuse by the injuries [the victim] had." She said her practice was the generally accepted methodology in how to determine whether or not there has been accidental trauma to a baby. The trial court found Dr. Turnbull qualified to testify as an expert in childhood critical care.

Dr. Turnbull testified consistently with her testimony from the above hearing regarding her education and professional background. Dr. Betters admitted the victim to the hospital, and Dr. Turnbull took over during the night shift into the next morning of January 5. She was familiar with the victim's medical history and relayed such to the jury. She said the victim continued to be unresponsive to treatment. She said the victim's brain was so injured that he was able to have the breathing tube in place and to be on the mechanical ventilator without any sort of pain medicine or sedating medicine in place. She said he was in a coma because of the severity of his brain injury. Based on the victim's physical exam, his imaging, and reports of the way the victim was injured, Dr. Turnbull opined that the victim sustained his brain injury due to abuse.

Dr. Turnbull said the victim had abrasions on his nose, a bruise under his left eye, and bruising behind both ears. She said babies the victim's age do not get bruises in these areas because they are physically unable to generate the force necessary to hurt themselves in those ways. The victim also had bruising to the tip of his penis, but no other injuries below his neck. The victim's pupils did not respond to light, which suggested a significant level of brain injury. The victim was young enough for the "soft spot" to be open, but it was not soft. The victim's soft spot was bulging and tense, which was indicative of

significant pressure inside the skull. She said the victim's head CT showed herniation, brain swelling, and bilateral subdural hematomas. The CT further showed the victim had fractures of his skull on both sides and a fracture in the left-sided frontal bone.

The history Dr. Turnbull was provided to explain the victim's injuries was that his father was carrying him up against his chest and tripped on a toy, which then led the Defendant to fall, and he landed on top of the victim. She did not recall learning that the Defendant did not actually land on top of the victim and that the victim was dropped and fell down the stairs. Dr. Turnbull's curriculum vitae was admitted into evidence while she was permitted to review the medical records. Upon reviewing the surgery notes, Dr. Turnbull clarified that the history reflected that the victim fell from the Defendant's arms and down a set of stairs. She said this history did not explain the victim's injuries, nor did the Defendant's theory that the victim's head struck the baseboard on the side of the staircase. She explained that babies' bones are softer than adult bones and designed to bend, not break. Had the victim suffered one bump against a hard surface, his skull would have bent, not broken, and certainly would not have caused three skull fractures. In other words, had the victim's head struck the baseboard, it would explain one skull fracture but not three separate fractures. She said the bilateral subdural hematomas were also consistent with abuse and not the explanation provided by the father for the victim's injuries. She said the defense theory that the Defendant did not fall atop the victim strengthened her opinion because the mechanism of injury of a one-month-old baby falling down the stairs cannot generate enough momentum to hit his head multiple times in multiple places or to cause the severity of the victim's injuries.

On cross-examination, Dr. Turnbull agreed that it was possible for a single impact to cause two fractures, one on each side of the head. She was unfamiliar with studies of children receiving bilateral skull fractures from falling down the stairs. She could not remember if she was told the victim's penis injury occurred prior to the day of the fall. She also could not remember if she was told that the bruise over the right eye was from a pre-existing injury. She could not remember the dimensions of the bruising behind the victim's ears, but she did not dispute the autopsy report. She did not have an opinion on how the Defendant would have inflicted the injuries behind the victim's ear other than dropping him on the stairs.

On redirect examination, Dr. Turnbull explained that "injuries that only involve the head that involve multiple fractures and subdural hematomas are pathognomonic for child abuse." Pathognomonic, she explained, meant "a constellation of symptoms that is so reproducibly associated with a diagnosis that we teach medical students, if you see this constellation of symptoms, it is pathognomonic for this." On recross examination, she reiterated that it meant "a group of exam findings and lab imaging finding[s] that are so consistently associated with one diagnosis, when you see that group of clinical signs and

labs and images, you automatically think that the diagnosis is going to be this thing unless proven otherwise[.]"  The victim's brain injuries with the bruises and the skull fractures and the subdural hematomas were a collection of symptoms "so strongly associated with abuse, we treat the child as if they have been abused unless something else comes up."  She denied "leap[ing] to conclusion[s]" and explained they often evaluate for bleeding and bone disorders.  She had cared for babies with osteogenesis imperfecta who sustain fractures to their bodies upon being born and babies with Vitamin D deficiencies and denied that the victim's bones broke in the same way.  In her nine years as an attending physician and twelve years in the intensive care unit, she had never seen injuries suspicious of child abuse that ended up being any other diagnosis.

The following testimony was adduced during the voir dire of Dr. Erin Carney.  Dr. Carney testified that she received a Bachelor of Science from the University of Tennessee and a Doctor of Medicine from Vanderbilt University Medical School.  She completed anatomic and clinical pathology residency at the Johns Hopkins Hospital and a forensic pathology fellowship at the State of Maryland Office of the Chief Medical Examiner.  She had been employed with the regional forensic center as a medical examiner since July of 2013.  Her practice and training at the Medical Examiner's Office are generally accepted in the scientific community throughout the United States.  Her curriculum vitae was admitted into evidence as an exhibit without objection.  On cross-examination, upon being asked if her opinion was that the victim was abused and that such abuse led to his death, she replied, "Yes."  She agreed however that all the victim's injuries were symptomatic of any sort of hard blunt force trauma.  Upon further questioning by the court, Dr. Carney stated that she conducted the autopsy of the victim.  Over defense counsel's objection of the court rehabilitating the State's purported expert witnesses, the court continued to question Dr. Carney extensively concerning twenty photographs the State anticipated to offer into evidence at trial to assist the medical examiner in explaining her testimony.  Ultimately, the trial court determined that Dr. Carney could testify as an expert forensic pathologist in the field of forensic medicine.

Dr. Carney testified consistently with her testimony from voir dire regarding her education and professional background.  She conducted the autopsy of the victim on January 6, 2020, and prepared a report of her findings and conclusions, which was admitted as an exhibit.  She explained her findings through photographs that were admitted as exhibits and opined that the victim died as a result of blunt force injuries of the head.  She determined the manner of death to be homicide and the circumstances of his death to be "beaten by assailant."  In determining the circumstances of his death to be beaten by an assailant, she spoke with law enforcement and was told the child was dropped down several carpeted stairs.  She asked specifically how high the child was dropped from and whether anyone fell on top of the child when he was dropped.  She was informed that no one fell on the child and that he was dropped and rolled down carpeted stairs.  She said the

explanation for the child's injuries was not consistent with the severity of his injuries. She emphasized the fact that the victim had fractures in multiple locations. She opined that an accidental fall was not a plausible explanation and that someone must have inflicted the injuries on the child and that it was a homicide because the child died at the hands of someone else. The victim did not suffer from any old fractures or subdurals and had injuries to his head and bruising to his penis.

On cross-examination, Dr. Carney said she had conducted 89 autopsies on children under the age of one. She had rarely seen skull fractures during an autopsy. She rejected defense counsel's implication that she lacked experience in autopsying an infant and stated that "it's very hard to break a child's skull so we don't see it often." She also explained that she was on the child death review board for Davidson County and reviewed many more autopsies than those she conducted alone. She agreed that it could take several hours before an infant with the victim's injuries could be noticeably in severe need of medical attention. She reviewed the photographs of the stairs from the Defendant's home and the police reports before coming to her conclusions as to the cause and manner of the victim's death. She did not find any healing bone fractures or older fractures during the autopsy. She denied that skull fractures in newborns were common from vaginal births. She agreed that she did not conduct any testing to determine the age of the victim's skull fractures. She agreed that an accidental fall onto a hard surface tended to cause a single linear fracture but if the fall were on the top of the head, it may create a comminuted fracture so that the fractures radiate from one point. Asked specifically if a single blow to the top of the head could cause fractures on both sides of the head that are disconnected, she replied

I believe that a blow to the top of the head can cause a comminuted fracture. So fractures that are all connected or maybe fractures that radiate out from one point. But to have multiple fractures in multiple locations all related to one blow, no, I don't believe that that could happen.

Dr. Carney agreed that it was possible for the skull to be compressed and for the compression action to cause separate fractures. She explained, however, that compression is between two surfaces, not one hit to the top of the head. She believed in compression causing fractures to the sides of the head; however, she said this would require a significant amount of force to cause fracturing of the skull in the victim. She disagreed that one hit to the victim's skull would have caused five fractures in five different locations. She did not test the victim's body to determine if he had a Vitamin D deficiency or osteogenesis imperfecta. She explained Vitamin D deficiency had to be significant and it occurs over time. She said the skull fractures were illustrated in the photographs; however, she did not create a diagram of them. She was asked to draw on unspecified photographs where the fractures were located and she complied. She agreed that a skull fracture itself could cause

a bruise inside the scalp; however, she said the victim had bruising in three different areas of his scalp.  She agreed that bruising could come from tumbling down carpeted stairs.

Regarding the victim's retinal hemorrhages, Dr. Carney agreed that accidents can cause hemorrhages to the eye but the pattern of retinal hemorrhaging in an abused child is different than a child with an accidental injury.  She cited medical literature in support of her assertion that abusive retinal hemorrhages are throughout the eye, flame-shaped, and dot-like.  In contrast, accidental retinal hemorrhages are much more limited.  She disagreed that "force is force" and explained that the amount of force is different.  She said slapping a child's head against a baseboard involved much more acceleration and force versus dropping a child.  She maintained that the amount of retinal bleeding and the diffuse nature of the retinal bleeding in this case showed there was more than one fall or strike.

Dr. Carney was familiar with a 2011 study by Lantz and Couture involving fatal injury from a stairway fall.  She agreed that the study documented subdural hematomas, and retinal hemorrhages which caused no skull fractures; and the child died in that case.  Asked if that was not abuse, Dr. Carney said there was a question raised after the study regarding whether the child had coagulopathy that was undiagnosed.  She conceded that the victim may not have been tested for this and needed to review her records.  She denied the marks on the victim's arms were "scratches" and stated they were needle puncture wounds from the IVs.  She agreed there were no cuts on the victim.  She agreed that the victim's nose appeared to have a scrape of the skin, and that the ear injury could have been from carpet burn.  She was aware that the bruising of the victim's penis was unexplained and reportedly from a pre-existing injury for which he was supposed to be taken to the doctor and examined.  She said the victim's penis was "clearly" bruised at autopsy.

**Defense Proof.**  Helena Salisbury testified that her son was the Defendant's best friend throughout high school.  She had known the Defendant since he was sixteen years old.  She had observed him around his children and testified that he "loved them babies," that they were always with him, and that the Defendant always played with them and took care of them.  Asked her opinion of whether the Defendant was a violent person, she testified that he was a peaceful person.  On cross-examination, she agreed that she had observed the Defendant verbally discipline his children; however, he had never spanked them.  Emily Guntle testified that she grew up with the Defendant and had known him since she was twelve years old.  She previously dated the Defendant and observed his relationship with his children.  She said she babysat for him, and he babysat for her.  She said she knew the Defendant to be a peaceful person.

Kimberly Clark, the Defendant's mother, testified that she adopted the Defendant when he was four years old.  She had known the Defendant for twenty years and observed

- 28 -

him around his children.  She said he was very loving and patient with them.  He played with the children and their toys all the time.  She said the Defendant was a peaceful person.

On cross-examination, she agreed that she had a conversation with her son on June 1 about watching children and making sure they stay awake.  She told him if they throw up or if they fall asleep or attempt to, the Defendant needed to take them to the hospital.  Stephanie Trussell, the Defendant's half-sister, testified that she had known the Defendant for ten years.  During that time, she observed the Defendant with his children and opined that the Defendant was a peaceful person.

Mother was recalled and testified on behalf of the Defendant.  She said she threw the Defendant's phone out the window when the Defendant was incarcerated.  Asked about texts being deleted from the Defendant's phone, she said she let her older three-year-old son play with it before she threw it out the window.  She admitted that she deleted some "apps and things" from the phone because she did not want her three-year-old to get into anything.  She said the Defendant had never been violent with her.  On cross-examination, she said she could not imagine the Defendant doing this to the victim.  In the beginning, she was very supportive of him.  She said the Defendant and his biological mother asked her to throw the phone out of the window.  After speaking with investigators, she retrieved the phone and turned it over to them.  She reaffirmed her testimony that when she got in the car on the day the victim died, she believed the Defendant when he told her that he had taken the victim to the doctor.  She said that the victim remained covered throughout their trip to Walmart and their return home.  She looked at him before they went inside Walmart; however, he appeared to be sleeping.  On redirect examination, she acknowledged that the Defendant asked her to delete his Facebook, not any text messages.

Angel Liggins, the Defendant's biological mother, denied that she told Mother to throw out the Defendant's phone.  On cross-examination, she agreed that she had told Investigator Norris that he was not getting any phones.  She also denied that she was a convicted felon.  She denied forcing Mother to do anything with the phone.  On redirect examination, she explained that the police retrieved thirteen phones from her.

The Defendant's older stepson, age six at the time of trial, testified that a promise was something that you say that you will do, and you are absolutely going to do it for somebody.  He said he understood the difference between the truth and a lie.  He said he did not remember the day the victim was taken to the hospital.  A tape was played from a recorded interview he gave to the Child Advocacy Center the day after the offense to refresh his recollection.  The State stipulated to the authenticity of the video, and it was admitted into evidence and shown to the jury under the past recollection recorded exception to the rule against hearsay.

During the interview, Stepson said that he felt safe with the Defendant and that the Defendant had not done anything to hurt or scare him. Asked if he had seen the Defendant hurt anyone else, Stepson said, "Yeah." Stepson said he would talk and write about it on the drawing board later in the interview. When asked the same question shortly thereafter, Stepson replied, "I said no." Asked if he had seen anyone hurt the victim, Stepson said, "No. My brother's good." Stepson was asked if anyone had talked to him about coming to the center that day and the following exchange occurred:

Q: [D]id anyone talk to you about coming here today?
A: Yea.
Q: Who talked to you?
A: Um. Let's go ask my mom first.
Q: Well, we can talk to her in a little bit. Okay? You said someone talked to you about coming here? What did they say to you?
A: Nothing.
Q: [H]as anyone told you what to say to me today?
A: Yea.
Q: Who told you what to say?
A: I gotta ask my mom first.
Q: Well, hang on just a minute [Stepson]. We will ask her in just a second. Okay? What did they tell you to say to me?
A: They said to talk to you.
Q: Did they say anything else [Stepson]?
A: Yea.

The interviewer took a break from questioning Stepson for approximately four minutes. When the interview resumed, the following exchange occurred:

Q: So [Stepson], I'm going to tell you something I heard okay?
A: (nods yes)
Q: I heard that you went to the hospital recently.
A: When I was sick. No, I didn't. I didn't fall. My brother and my daddy did.
Q: Your brother and your daddy did?
A: Yea. He can't open his mouth.
Q: [Stepson], did you see your brother and your daddy fall down the stairs?
A: Yea. I seen him drop him.
Q: Tell me everything you saw.
A: I saw him bounce and like drop and then he flew, and he can't open his mouth.
Q: Did your daddy say anything when that happened?
A: No. He said he fell down once so we have to talk about him.

Q: Tell me what happened after he fell down the stairs.
A: They fell down once. That's the only word I can tell you.
Q: What was the very next thing that happened?
A: Um. Well, I don't know. I don't know the very thing happened.
Q: What did your brother look like after he fell down the stairs?
A: He had a little bit of hair.
Q: [Stepson], tell me one more time because I don't think I really understood. Tell me exactly what you saw with your daddy and your brother.
A: Um. I saw them falling down and I don't know. I don't know the other word.
Q: [Stepson], what were your daddy and your brother doing upstairs?
A: They tripped over my tractor while he was going downstairs getting ready.
Q: [Stepson], did you see them trip over your tractor?
A: Yea.
Q: Did you see anything else happen?
A: No.
Q: [Stepson], when your daddy and your brother fell down the stairs, has that kind of thing happened one time or more than one time?
A: They fell down at once.
Q: [Stepson], did your daddy or your brother say anything about getting hurt when they fell down the stairs?
A: Well, he flew. He fell down at once.
Q: Who did?
A: [The victim] and daddy.
Q: [Stepson], did you notice anything about [the victim] being hurt, or crying, or bleeding, or anything like that?
A: He didn't bleed. His nose was kinda orange.
Q: Did your daddy say anything after that happened?
A: He said he fell down at once.
Q: [Stepson], I want to make sure I understand, okay? You told me that your brother fell down the stairs and you saw that. Did your daddy fall down the stairs?
A: Yea.
Q: [Stepson], where were you when your brother fell down the stairs?
A: I was upstairs doing something in my bedroom. I was making something for my dad. I was making something for [the victim].
Q: Okay. Well, I am going to ask you one more question because again I think I am just confused. [Stepson], did you actually see your brother and your daddy fall down the stairs?
A: Yes. I seen them upstairs and I was coming down and I seen them falling down. He was rolling down a little bit.

Q: [Stepson], I have one more question. If anyone were to ever do something to you or hurt you or that you didn't like, who could you tell?
A: Tell my mom.
Q: Who else could you tell?
A: Nanny, too.

Dr. John Hunsaker testified on behalf of the defense as an expert in forensic pathology without objection from the State. Dr. Hunsaker was not a medical examiner, and he had not practiced forensic pathology since 2013. In making his conclusion in this case, he reviewed the autopsy report, photographs from the home and of the stairs where the fall was alleged to have occurred, various medical records, and law enforcement reports. Dr. Hunsaker agreed with Dr. Carney that victim's death was caused by blunt force injuries, but he disagreed that the manner of the victim's death was homicide. Dr. Hunsaker believed that a pathologist's role was limited to the cause of the injury, which was inconsistent with a determination of abuse. He reviewed the Defendant's statement and opined that the victim's injuries were consistent with the Defendant's version of how the fall occurred. Dr. Hunsaker disagreed that a single impact is capable of causing more than one fracture in the skull in situations involving an infant falling from a relatively low height. He said whether the fractures touched each other depended on various factors including the amount of force, mass of momentum, and the nature of the surface. Based on his review of the staircase photographs, he opined that the victim's head had more than one strike or impact and that the carpet lessened the impact. Despite the carpet, he further opined that it was possible that the victim suffered one or more fractures from hitting his head on the wood or from hitting the remainder of the stairs. He said complex fractures, as in this case, can occur and studies have shown that children have died from falling down the stairs. He relied on studies by Patrick Lantz regarding bleeding in the eyeballs and retinal hemorrhages and a book by Jan Leetsma and Kirk Thibault, discussing the ability to get multiple fractures from a single impact. He did not agree that retinal hemorrhaging was a sign of abuse.

Dr. Hunsaker opined that the victim suffered "at least one head impact against some object that was firm that led to a fracture in that region." He believed the most likely point of initial impact was on the left side of the victim's head around and above the left ear. He said, "forces were transmitted and . . . some of those other fractures were caused[.]" He acknowledged there was bleeding in three separate parts of the victim's brain; however, he said the bleeding was caused by the single forceful impact, such as falling. He believed there was more than one impact as the victim tumbled down the stairs. He later clarified that it was less likely that a single forceful impact could have caused the multiple areas of bleeding. Asked to explain how the mechanism of a single impact in one place could result in disconnected fractures in other places in the skull, Dr. Hunsaker said it was best to utilize a biomechanical engineer; however, he opined the infant skull is pliable and if impacted

on one side, it could result in "compressive forces" causing impact to the other side. Dr. Hunsaker explained that some head trauma patients experience a "lucid interval" which meant that after the head injury, the patient may experience a loss of consciousness, regain consciousness, and later die from the head injury. He said during the lucid interval the patient neurologically functions "more or less normally." Dr. Hunsaker said the fractures were not visible to the naked eye; however, they could be seen during the autopsy. He said it would have been difficult for a layperson to know that the victim was suffering from "brain bleeding" and that there was no magic number for when the symptoms would become noticeable.

Dr. Hunsaker conceded on cross-examination that the vast majority of children who fall down stairs do not have injury or visit the critical care unit at the hospital. He said he was testifying to provide an alternate theory to the medical examiner's report and conceded that his theory of "contrecoup injuries" may not have occurred in this case. He agreed that he had omitted from his report the study by Zielinski, which examined over 900,000 reports of similar falls that resulted in zero deaths. Dr. Hunsaker agreed that his report and conclusion assumed that the Defendant's version of what happened to the victim was true and, if the Defendant had lied, Dr. Hunsaker would reconsider his opinion.

The Defendant testified that at the time of the offense he was the caretaker of his and Mother's children, the victim, his three-year old stepbrother, and his two-and-a-half-year-old sister. He said the night before the victim's death Mother pointed out the victim's injury to his penis. He denied striking the victim or pinching his penis. He did not characterize the victim's penis as bruised, and instead described it as swollen and red. He said he and Mother agreed to take the victim to the doctor the next morning if the victim's penis irritation did not improve. The next morning the Defendant took Mother to work and examined the victim's penis when he returned home. He believed the ice he had put on it the night before had caused the swelling to subside. He did not believe he needed to take the victim to the doctor. He agreed that he had falsely told Mother that he had taken the victim to the doctor that morning. He explained that he lied to her because she had high anxiety and he did not want to worry her at work. However, he clarified that he called Mother from home and told her that he had already taken the victim to the doctor. He did not tell her in the car when he picked her up from work.

Based on the Defendant's cellphone records, he agreed that the victim was injured around 8:30 that morning. He said when they returned from taking Mother to work, he changed the victim's diaper upstairs. When he was on his way down the stairs, his three-year-old stepson had left a toy on the stairs. The Defendant described what happened next as follows:

[W]hat I did in mid step on my left foot, I stepped on that toy and it come out . . . it slid. So my leg slid in mid step and I'm already going forward a little bit and so my body pivots a little bit to the left – I guess would be counterclockwise – and then I go down and I tried to catch myself. But, I mean, everything happened too quickly and I didn't want to hold on to [the victim] as crazy as that sounds because I – if I had done that, I felt like the injury would have increased and that's what I tried to keep from. I did not want to fall on him.

The Defendant agreed that the toy previously admitted into evidence by the State was the same toy upon which he tripped. He demonstrated to the jury how he was holding the victim in his left arm when he fell down the stairs. He said he tried to catch himself with his right arm when he fell. Although everything happened quickly, the Defendant said he observed the victim's head going toward the baseboard. He said his three-year-old stepson was standing at the base of the stairs looking up at him. Although his three-year-old stepson said that he was in his room when this happened, the Defendant said he "might be slightly confused." When the victim was at the bottom of the stairs, he threw up. The Defendant was not alarmed when the victim threw up after the fall because, in his experience, children would often do so. The Defendant picked him up and examined him to ensure he was alright. The Defendant observed blood inside the victim's mouth at the top of his lip. The Defendant cleaned the blood from the victim with some baby wipes. The Defendant said the victim's nose was skinned up, but there was no blood anywhere else on his body. The Defendant said the victim cried for only a short time, and when the Defendant fed the victim, it appeared to soothe him. The Defendant then went back to the toy, picked it up, and placed it in his three-year-old son's toybox upstairs.

The Defendant, the victim, and his three-year-old brother/stepson sat on the couch and watched cartoons. During this time, the Defendant conducted internet searches for symptoms to be aware of when a child falls down stairs, and the Defendant did not let the victim fall asleep. He did not believe he needed to take the victim to the hospital unless he observed issues with the victim, and he did not see any "real problems" with him. Shortly thereafter, around ten o'clock, the Defendant and his children went to pick up Mother from work. Mother had not been relieved from work at that time, so the Defendant returned to pick her up at 11:20 that morning. During this time, he had not observed any issues with the victim. He repeated that he told Mother that he had taken the victim to the doctor earlier that morning by phone and that he told her about the fall when she got into the car. Mother looked at the victim, observed his nose was skinned, and said the victim looked fine.

They proceeded to Walmart, and the victim's eyes were open at that time. He agreed that they were in Walmart for roughly forty-five minutes. When they returned home, Mother took the victim out of his car seat and observed "something was really wrong."

- 34 -

The Defendant agreed, and they took the victim to the hospital. Once at the hospital, the Defendant dropped Mother and the victim at the front door, and the Defendant and his stepson parked the car. The Defendant eventually took his three-year-old stepson to his parents' home, and he immediately returned to the hospital. By the time he returned, Mother and the victim were already in the back of the hospital, and he was not permitted to join them. The Defendant explained that he was not crying during this time because he did not show his emotions publicly, he held things inside, and that he had been that way his entire life.

The Defendant's initial interaction with the police was at the first hospital. He said he cooperated with them and consented to a drug and toxicology test. He said they did not "outright" tell him he was suspected of child abuse until he arrived at VUMC. Other than telling Investigator Norris where the wipes were in the trash can, he did not dispute Investigator Norris' account of what occurred at his home. He returned to the hospital, and after several hours, he was told the victim was not going to survive. He said he loved his children, and he denied beating the victim. Had he known something was seriously wrong with the victim, he would have immediately taken him to the hospital.

On cross-examination, the Defendant maintained that Mother pointed out the victim's penis irritation to him and he denied that he pinched the victim's penis.[2] He agreed that he initially lied about taking the victim to the doctor to examine his penis. He rejected the insinuation that he did not do so to avoid stressing Mother based on several text messages cursing her when he picked her up from work. He agreed however that when Mother did not initially come out the first time that he attempted to pick her up from work, he became angry because he had the children in the car, and they were getting "antsy." He denied that verbal aggression is the same as physical violence, and he maintained that he had never assaulted anyone, especially his wife and children. The Defendant maintained that his version of how the victim sustained his injuries was true. He said he did not include the information about his three-year-old stepson being at the bottom of the steps when he fell in his statement because he was concerned with the victim and wanted to see him. Upon being shown one of the pages from a website the Defendant accessed which stated, "Get immediate medical attention[,]" the Defendant explained the full context which included only if the child had significant external injuries, was unconscious, or seemed confused or disoriented. The Defendant denied the victim suffered from any of these symptoms.

---

[2] The record reflects that the State played various unidentified excerpts of phone recordings between the Defendant and Mother during his cross-examination. Because the record does not transcribe these excerpts or reference where they are located, we are unable to consider them in this appeal. This does not impact our decision in this case.

At the close of the defense proof, the State offered the following rebuttal testimony. Investigator Norris testified that when the Defendant showed them how he fell down the stairs, he did not fall down to his knees as he demonstrated in his prior testimony. He said the Defendant was wearing shorts on the day of the interview, and Investigator Norris did not observe any injuries to the Defendant's knees. Investigator Norris was present during the Child Advocacy Center ("CAC") interview of the Defendant's three-year-old stepson, and he heard him say that "he was upstairs in his room playing with toys while he heard his aunt fall – or seen his dad fall down the stairs with [the victim]." Investigator Norris took photographs from the three-year-old's room to determine if he could have seen the Defendant fall from that vantage point. Based on these photographs, Investigator Norris opined that the three-year-old stepson could not have observed the Defendant fall down the stairs.

On cross-examination, Investigator Norris agreed that the three-year-old stepson made multiple statements about being in his room and seeing his father and the victim fall. Asked if his statements were inconsistent, Investigator Norris said yes. He agreed that he did not make this a part of his investigation.

Rachel Fuller, the forensic examiner for the CAC in Coffee County, testified that she conducted the three-year-old stepson's forensic interview. She said she was there to facilitate a conversation with him, and not to lead him into giving a certain answer. As part of her introductory questions, Fuller asked, "Has anyone talked to you about coming to speak with me today?" and "Has anyone told you what to tell me today?" In response, the three-year-old told her, "Uh-huh[,]" and "Well, we need to speak to Mommy." On cross-examination, she could not recall exactly what his responses were to her questions.

Dr. Lowen was recalled and testified that several things "jumped out" to her upon review of Dr. Hunsaker's report. She said it was "very unusual for a medical provider" to use the standard he used in his report. She also said he used "odd" quotes from medical literature and articles. She said his reliance on the Lantz article was problematic because a child dying from a stair fall is incredibly unusual, and no one witnessed the fall. She also said the article did not examine whether the child had an underlying bleeding disorder. She said the article had no bearing on the instant case. She also disputed Dr. Hunsaker's analysis of Leestma's book and said that Dr. Hunsaker misstated its conclusions. Finally, regarding the third article by Mandy O'Hara, Dr. Lowen said Dr. Hunsaker's reliance on it was misplaced and unrelated to the instant case. Other than the Mandy O'Hara article, she opined that none of the articles relied upon by Dr. Hunsaker were generally accepted in the medical scientific community.

- 36 -

In surrebuttal, Kimberly Clark testified that when the Defendant dropped off the three-year-old stepson at her home, the three-year-old stepson told her, "Daddy and [the victim] fell down the stairs like this." She told him, "I know, Sweetie, it will be okay."

Based on the above evidence, the jury convicted the Defendant of two counts of reckless homicide, aggravated child abuse, and aggravated child neglect. Following a sentencing hearing, the trial court imposed an effective sentence of twenty-three years imprisonment. It is from these judgments that the Defendant now appeals.

## ANALYSIS

**I**. **Ambiguous Verdict.** As an issue of first impression in Tennessee, the Defendant argues that he is entitled to a new trial or dismissal of his convictions because the verdict within each count of his indictment was self-contradictory and ambiguous. In response, the State contends the Defendant has waived his ambiguous verdict claim by failing to request a poll of the jury in the trial court. Waiver notwithstanding, the State insists the jury's verdict was not ambiguous. For the reasons that follow, we agree with the Defendant and conclude that his convictions are ambiguous and self-contradictory. Accordingly, we are compelled to reverse and vacate the Defendant's convictions and remand for a new trial.

In this case, the trial court instructed the jury, consistent with Tennessee law, to first consider the most serious offense and to proceed to lesser-included offenses only after reaching a unanimous verdict of acquittal on the greater offense. When the jury announced its verdict, the following exchange occurred:

> THE COURT: Ladies and gentlemen, I understand that you have reached a verdict. The clerk is going to hand it to me and make sure it's in proper form. Very well, Mr. Foreman, if you will go ahead and –jury, please rise—[D]efendant, please rise. Please read the verdict.
>
> JURY FOREPERSON: Count 1, the jury finds the [D]efendant guilty of reckless homicide.
>
> THE COURT: Very well, As to Count 2.
>
> JURY FOREPERSON: Count 2, the jury finds the [D]efendant guilty of reckless homicide.
>
> THE COURT: Very well, Count 3.

JURY FOREPERSON: Count 3, the jury finds the [D]efendant guilty of aggravated child abuse.

THE COURT: Very well, As to Count 4.

JURY FOREPERSON: Count 4, the jury finds the [D]efendant guilty of aggravated child neglect.

THE COURT:  Is that your collective verdict?

JURY FOREPERSON:  That is our collective verdict.

THE COURT: Thank you.

The jury was then discharged and dismissed.  At the December sentencing hearing, defense counsel advised the court that the presentence report officer had given him a copy of the verdict forms.  Upon his review, defense counsel observed for the first time that for each count in the indictment, the jury convicted the Defendant of the greater offense and continued to mark not guilty for each of the lesser included offenses.  For clarity, the verdict forms, as shown below, reflect as follows,

COUNT I

WE THE JURY FIND THE DEFENDANT, GAVIN CLARK
_____ GUILTY
__X__ NOT GUILTY

OF FIRST-DEGREE FELONY MURDER BY THE COMMISSION OF AGGRAVATED CHILD ABUSE.

LESSER INCLUDED OFFENSES

WE THE JURY FIND THE DEFENDANT
_____ GUILTY
__X__ NOT GUILTY

OF SECOND-DEGREE MURDER.

WE THE JURY FIND THE DEFENDANT
__X__ GUILTY
_____ NOT GUILTY

OF RECKLESS HOMICIDE.

WE THE JURY FIND THE DEFENDANT
_____ GUILTY
__X__ NOT GUILTY

OF CRIMINALLY NEGLIGENT HOMICIDE.

COUNT II

WE THE JURY FIND THE DEFENDANT, GAVIN CLARK
_____ GUILTY
__X__ NOT GUILTY

OF FIRST DEGREE FELONY MURDER BY AGGRAVATED CHILD NEGLECT.

LESSER INCLUDED OFFENSES

WE THE JURY FIND THE DEFENDANT
_____ GUILTY
__X__ NOT GUILTY

OF SECOND- DEGREE MURDER.

WE THE JURY FIND THE DEFENDANT
__X__ GUILTY
_____ NOT GUILTY

OF RECKLESS HOMICIDE.

WE THE JURY FIND THE DEFENDANT
_____ GUILTY
__X__ NOT GUILTY

OF CRIMINALLY NEGLIGENT HOMICIDE.



In his motion for new trial, the Defendant argued that "the verdict for each count is ambiguous and self-contradictory, namely by both convicting and acquitting the Defendant." The Defendant relied on United States v. Randolph, 794 F.3d 602 (6th Cir. 2015), holding that "[w]here a verdict, within the same count, both condemns and also acquits the accused, it is too ambiguous and self-contradictory to justify criminal punishment." Although the Defendant requested a new trial as a remedy, he also argued that any retrial should be actually barred by double jeopardy and the indictment dismissed. United States v. Pierce, 940 F.3d 817, 823-24 (2nd Cir. 2019); but see State v. Hansen, 237 Ariz. 61, 65-67 345 P.3d 116, 120-22 (Ct. App. 2015). In denying this issue, the trial court orally stated,

> A more rational analysis of the verdict form clearly shows that the jury did exactly what they were instructed to. They considered the offenses from highest offense to the lowest offense, and they went down from there. And in any event, case law supports that jury form inconsistencies do not necessarily warrant vacation of a conviction. The jury form has to be so inconsistent that an appellate court or any rational reviewer could not make any sense out of what the jury was trying to do. In this case, it's clear what the jury was trying to do.

The trial court supported its denial of relief by reliance on United States v. Dunn, 284 U.S. 390 (1932) and United States v. Powell, 469 U.S. 57 (1984). It also determined that Randolph did not apply because it "involved an extremely confusing verdict form wherein the jury was required to find each of multiple defendants guilty or not guilty of numerous conspiracy counts."

Because this is an issue of first impression in Tennessee, the precise standard of review for determining whether a verdict is ambiguous is unclear. Regardless of the standard of review to be applied, we assume without deciding that whether a verdict is internally inconsistent and thus ambiguous is a question of law that appellate courts review de novo.

It has long been settled that "[a] jury verdict must be in language which is clear and certain as to its meaning and which cannot be mistaken." State v. Smith, 836 S.W.2d 137, 143 (Tenn. Crim. App. 1992) (citing Baldwin v. State, 213 Tenn. 49, 372 S.W.2d 188 (Tenn. 1963)). Our supreme court has observed,

> Since the reception of a verdict is not solely a ministerial as distinct from a judicial act, when the jury return into court with a verdict, it is not a matter of course to receive it in the form in which it is rendered. It is the duty of the Court ... to look after its form and substance, so far as to prevent an unintelligible, or a doubtful, or an insufficient verdict from passing into the records of the court.

State v. Henley, 774 S.W.2d 908, 915 (Tenn. 1989) (citation omitted). If the trial court finds a jury's verdict to be unclear or doubtful, the court has the power and the duty to send the jury back to the jury room with directions to amend the verdict and put it in proper form. Smith, 836 S.W.2d at 143.

When a jury, as the trier of fact, returns an incomplete or inaccurate verdict that does not conform to the applicable law, the verdict is illegal, a nullity, and, therefore, void. As a result, a trial court cannot accept the verdict because a judgment cannot be pronounced upon a void verdict. If the verdict is to be corrected, the trial court must take immediate action before the jury is discharged. The trial court should advise the jury that the court cannot accept the verdict, direct the jury to either reread the charge given by the court or the court can give a supplemental charge, and have the jury retire to consider its verdict. As the Supreme Court said in Jones v. State, 569 S.W.2d 462, 464 (Tenn. 1978):

> The trial judge has both the power and the duty to require that the jury correct or amend an improper or incomplete verdict.... The trial judge has the right and duty to mold a judgment in accordance with the final verdict returned by the jury.... But this does not carry with it the right to substitute for the rendered verdict a judgment that is substantially different.

Once the jury is discharged, its verdict can not be amended or corrected by the trial court as to the grade of the offense or the sentence imposed. State v. Jefferson, 938 S.W.2d 1,

21-22 (Tenn. Crim. App. 1996), abrogated by State v. Moon, 644 S.W.3d 72 (Tenn. 2022) (internal footnotes omitted).

An inconsistent verdict is not the same as an ambiguous or self-contradictory verdict. An inconsistent verdict most commonly occurs in a multi-count indictment when a jury, on a single set of facts and circumstances, convicts a defendant of one offense while acquitting them of another offense, even though both charges stem from the same criminal act. In contrast, an ambiguous or self-contradictory verdict arises when the jury's finding within the same count of the indictment against the same defendant cannot be reconciled, rendering the verdict unenforceable. Randolph, 794 F.3d 602, 611 (6th Cir. 2015) (addressing distinction between inconsistent and ambiguous verdicts). While inconsistent verdicts are permissible, ambiguous or self-contradictory verdicts are not. Inconsistent verdicts are permitted as long as there is sufficient evidence for a rational trier of fact to find a defendant guilty beyond a reasonable doubt. Dunn, 284 U.S. 390, 393 (1932), overruled on other grounds by Sealfon v United States, 332 U.S. 575 (1948). Appellate courts in Tennessee have consistently declined to disturb one conviction on the basis that the jury's acquittal on another offense is inconsistent, even when the elements and evidence of the two offenses intertwine or are the same. Nelson v. State, No. W2012-00521-CCA-R3-CD, 2013 WL 12182612, at *6-7 (Tenn. Crim. App. Aug. 19, 2013) (discussing inconsistent verdicts and application of Dunn rule). This is because "[c]ourts have always resisted inquiring into a jury's thought processes." Id. (citing Powell, 469 U.S. at 67 (1984)). Courts have also declined to allow defendants to challenge inconsistent verdicts because the verdict could have been a result of jury nullification, compromise, lenity, or an error that benefits the defendant.

The same rationale does not apply to an ambiguous or self-contradictory verdict returned on a single count. An ambiguous or self-contradictory verdict occurs when the jury's findings are unclear or internally inconsistent within the same count of the indictment, making it impossible to determine the jury's intent or the basis of their decision. Because we are unable to determine the jury's intent from an ambiguous or self-contradictory verdict, the verdict is void and a nullity. See Cook v. United States, 379 F.2d 966, 970 (5th Cir. 1967) ("There is no verdict as long as there is any uncertainty or contingency to the finality of the jury's determination."). In other words, a verdict of guilt and acquittal together prevent either one from functioning, and it cannot be given full effect. Randolph, 794 F.3d at 611; Hansen, 237 Ariz. at 68. Unlike inconsistent verdicts, an ambiguous verdict requires corrective action by the trial court. See e.g., United States v. Lee, 532 F.2d 911, 913 (3d Cir. 1976) ("[A] verdict must be unqualified and unambiguous," and "[a] trial court may not accept a verdict if it is defective but must either direct the jury to retire for further deliberation or declare a mistrial."). An example of an ambiguous verdict occurs if the jury finds a defendant guilty of a greater offense but also not guilty by reason of insanity. See State v. Huskey, 66 S.W.3d 905, 923 (Tenn. 2001);

Hansen, 237 Ariz. at 63 (noting that logically if one has not committed the lesser offense, one cannot have committed the greater offense). When a trial court is presented with a verdict finding a defendant guilty and not guilty of the same offense, or guilty of one crime and not guilty of its lesser included offense, the best practice for the court is to attempt to discern the jury's intention and remove the ambiguity from the verdict, if possible. See United States v. McCaleb, 552 F.3d 1053, 1058 (9th Cir. 2009) (recognizing "such a practice 'comports with common sense as well as efficiency and fairness'" (quoting Larson v. Neimi, 9 F.3d 1397, 1402 (9th Cir. 1993)). Finally, "[t]he test for validity of the verdict is whether it 'was certain, unqualified and unambiguous considering the circumstances of the receipt of the verdict and poll of the jurors relative to their verdict.'" See United States v. Morris, 612 F.2d 483, 490 (10th Cir.1979) (quoting Cook, 379 F.2d at 968); State v. Marin, 490 P.2d 1170, 1172 (Arizona Sup. Ct. 1971) (verdict valid when jury's intent "unmistakably expressed")).

The State argues that the Defendant has waived his ambiguous verdict claim because he failed to poll the jury. We disagree. Rule 31(e) of the Tennessee Rules of Criminal Procedure provides that "[a]fter a verdict is returned but before the verdict is recorded, the court shall--on a party's request or on the court's own initiative--poll the jurors individually. If the poll indicates that there is not unanimous concurrence in the verdict, the court may discharge the jury or direct the jury to retire for further deliberations." In this case, prior to announcing the verdict, the trial court stated, "The clerk is going to hand it to me and make sure it's in proper form." The trial court then stated, "Very well[.]" Based on this comment, we presume the trial court reviewed the verdict forms and overlooked the fact that the jury returned verdicts of conviction and acquittal in the same counts. Because the trial court erroneously concluded that the verdict forms were proper, the Defendant had no means to know that the jury acquitted the Defendant of lesser included offenses while convicting him of the greater offenses, and he had no basis upon which to object. It is the duty of the trial court to ensure that the verdict forms were proper. Henley, 774 S.W.2d at 915. By failing to recognize that the verdict forms were not in proper form, the trial court deprived the parties of an opportunity to request that the jury return to deliberate and clarify their verdict. To hold otherwise would impose a duty upon trial counsel to review the verdict forms after the trial court has done so, which is not required by our law. See e.g. State v. Dorsey, 706 S.W.2d 478, 481 (Mo. Ct. App. 1986) (rejecting waiver argument and noting that the defendant could not have known of the inconsistency in the verdict forms without taking a most unusual step of going forward to examine all the verdict forms before the jury was discharged). Moreover, even if trial counsel had polled the jury, polling would have disclosed the unanimity of the jury and not the errors in the verdict forms. Accordingly, we will review this issue on the merits.

The State urges this court to employ a "common sense" approach to interpreting the verdict forms and presume the jury followed the trial court's acquittal first jury instructions

in finding the Defendant guilty of the greater offense. The State maintains that the markings by the lesser included offenses on the verdict forms should be considered mere surplusage. The State also argues the jury's intent was to convict the Defendant of the greater offense, and any error in marking the lesser offenses is harmless. See Ray v. State, 27 S.W.3d 384, 386 (Arkansas Sup. Ct. 2000) (rejecting defendant's claim that verdict forms which showed guilty of first-degree murder and not guilty of capital and second-degree murder, a lesser included offense were "inconsistent" because "[t]he intent of the jury to convict appellant of first-degree murder and not to convict of either capital murder, or second-degree murder was made clear by the return of all three forms"); State v. Brown, 464 P.3d 938, 944-45 (Kansas Sup. Ct. 2020) (noting that "when [the jury's] intent is *clear*, a mistaken description of the crime of conviction contained in the verdict form may be discarded as 'surplusage' when the verdict form also refers to the correct charge by pointing back to the charging document or the jury instructions." (Emphasis added)). However, neither of these cases are illustrative of the factual situation here.

Based on the trial court's explicit verbal and written instructions to the jury to consider the lesser included offenses only if it found the Defendant not guilty of the greater offenses, we conclude that the jury's verdict as to each count prevented either one from functioning. Accordingly, the jury's verdicts cannot be given full effect. Hansen, 237 Ariz. at 68. Although the State argues the jury's intent to convict the Defendant of the greater offenses was evident, we disagree. There is nothing in the record from which this court may infer the jury's intent other than the verdict forms. The verdict forms in this case are so inherently self-contradictory that it is impossible to determine what the jury found. For example, in Counts 1 and 2, the verdict forms indicate that the jury found the Defendant guilty of reckless homicide but not guilty of criminally negligent homicide. According to the jury's instructions, in order to find the Defendant guilty of reckless homicide, it had to find both (1) that the Defendant killed the victim, and (2) that he acted recklessly. See Tenn. Code Ann. § 39-13-215; 39-11-106(34); 39-11-302. By finding the Defendant not guilty of criminally negligent homicide, however, the jury indicated that it considered the proof insufficient to establish beyond a reasonable doubt either (1) that the Defendant's conduct caused the death of the victim, or (2) that the Defendant acted with criminal negligence. See Tenn. Code Ann. § 39-13-212; 39-11-106(5); 39-11-302. Criminal negligence was defined for the jury, and the jury was further instructed that "[t]he requirement of criminal negligence is also established if it is shown that the defendant acted intentionally, knowingly or recklessly." See Tenn. Code Ann. § 39-11-301(2).

The jury's findings on these two Counts are logically irreconcilable and self-contradictory. If the jury found that the proof was insufficient to show that the Defendant's conduct caused the victim's death, then the jury could not have found that the Defendant killed the victim. Alternatively, if the jury found the proof insufficient to show that the Defendant acted with criminal negligence, then the jury could not have found that the

Defendant acted with the greater mens rea of recklessness, particularly as it was instructed that criminal negligence is established by recklessness.

Similarly, in Count 3, the verdict form indicates the jury found the Defendant guilty of aggravated child abuse but not guilty of knowing aggravated assault, reckless aggravated assault, child abuse, reckless endangerment, or assault. To convict the Defendant of aggravated child abuse, the jury had to determine (1) that the Defendant knowingly, other than by accidental means, treated a child under 18 in such a manner as to inflict injury, and (2) that the act of abuse resulted in serious bodily injury to the child. See Tenn. Code Ann. § 39-15-401, -402. "Serious bodily injury" was defined for the jury as "bodily injury" with additional requirements. See Tenn. Code Ann. § 39-11-106(3), (37). To acquit the Defendant of assault, however, the jury had to determine that the proof did not establish beyond a reasonable doubt at least one of two elements: either (1) that the Defendant caused bodily injury to another, or (2) that the Defendant acted either intentionally, knowingly, or recklessly. See Tenn. Code Ann. § 39-13-101(a)(1). Having found that the Defendant acted "knowingly," in convicting him of aggravated child abuse, the jury could not have simultaneously rejected that same mens rea in the lesser included offense; neither could the jury have found that he did not cause bodily injury to another, having previously found that the Defendant's treatment of the child caused serious bodily injury.

Without belaboring the point, the verdict forms as to each Count cannot be internally reconciled. These forms are ambiguous because they simultaneously assert two directly contradictory things, and it is accordingly impossible to glean what the jury actually found. These findings cannot be said to conform to applicable law and "are impossible in the sense that they cannot be given simultaneous effect." Hansen, 237 Ariz. at 68.

As outlined above, we consider the jury's return of a not guilty verdict on the lesser offenses as substantial evidence of conflicting intent and confusion. Moreover, while the markings indicating not guilty verdicts may have been an unintended mistake, we are prohibited from speculating about what the jury intended by their verdicts. Id. (citing State v. Rich, 184 Ariz. 179, 180-81, 907 P.2d 1382, 1383-84 (1995)) (noting jury not polled on verdict form for lesser-included offense and declining to speculate about "what the jury would have done" with further instruction and deliberations). Finally, even if we were to presume, as the State suggests, that the jury followed the trial court's acquittal first jury instruction in finding the Defendant guilty of the greater offenses, then we must give equal consideration to the Defendant in presuming that the markings on the lesser-included offenses reflect not guilty verdicts. In other words, although the State's position that the jury mistakenly marked the lesser-included offenses is certainly plausible, it is not the only plausible reading of the verdict forms. This is the inherent problem with an ambiguous or self-contradictory verdict. Accordingly, given the uncertainty about the jury's intended

meaning, we must reverse and vacate each of the Defendant's convictions. Hansen, 237 Ariz. at 65-69, 345 P.3d at 120-24.

We must now turn to address the remedy for this issue. The Defendant argues that the proper remedy upon reversal of an ambiguous and self-contradictory verdict is dismissal of the indictment. The Defendant relies principally upon the United States Supreme Court's recent decision in McElrath v. Georgia, 601 U. S. 87, 95-96, 144 S.Ct. 651, 217 L.Ed.2d 419 (2024). The State argues, at most, the remedy for an ambiguous and self-contradictory verdict is a remand for a new trial and not dismissal of the indictment on double jeopardy grounds. The State contends if the verdicts are truly ambiguous, then the jury did not acquit the Defendant of anything. Because the jury foreperson in this case made the same clerical mistake as in Hansen, the State urges this court to remand for a retrial on all originally charged offenses, including felony murder.

The United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution states that "no person shall, for the same offence, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. The federal and state prohibitions against double jeopardy have been construed as providing the same protections; these include: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. State v. Rimmer, 623 S.W.3d 235, 253 (Tenn. 2021) (citing North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989); and State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012)).

Often, when a jury considers a multi-count charge and returns a guilty verdict on one count but does not return a verdict on the remaining counts, the jury's silence on the remaining counts serves as an implied acquittal on them. Double jeopardy prevents retrial on the remaining counts. Rimmer, 623 S.W.3d at 253 (citing State v. Burns, 979 S.W.2d 276, 290-91 (Tenn. 1998)). However, "[w]hen a jury returns a guilty verdict on a greater offense after it has received [a sequential or acquittal first jury] instruction, it does not get a full opportunity to consider and return a verdict on the lesser counts. Under those circumstances, if the conviction on the greater offense is later overturned due to a procedural technicality, double jeopardy does not bar retrial on the lesser-included offenses. Rimmer, 623 S.W.3d at 253-54 (internal citations omitted).

The remedy in this case necessarily hinges upon whether the verdict forms constitute acquittals for double jeopardy purposes. Whether an acquittal has occurred for purposes of the Double Jeopardy Clause is a question of federal, not state law. McElrath,

- 45 -

601 U.S. at 96. In McElrath, the United States Supreme Court defined an acquittal as any "ruling relating to the ultimate question of guilt or innocence," whether or not the ruling is expressly labeled an acquittal. Id. This includes a "factual finding that necessarily establishes the criminal defendant's lack of criminal culpability." Evans v. Michigan, 568 U.S. 313, 319 (2013). Such an action or ruling must reflect "a final resolution" finding the defendant not guilty for it to constitute an acquittal and a bar to re-prosecution. Blueford v. Arkansas, 566 U.S. 599, 606, 132 S. Ct. 2044, 182 L.Ed.2d 937 (2012). Moreover, an "acquittal" for double-jeopardy purposes requires a final resolution or adjudication of "the bottom-line question of 'criminal culpability.'" Smith v. United States, 599 U.S. 236, 253, 143 S.Ct. 1594, 216 L.Ed.2d 238 (2023) (quoting Evans, 568 U.S. 313 at 324 n.6). Such finality is necessary to serve the interests the Double Jeopardy Clause protects, as "it has long been settled under the Fifth Amendment that ... [an] acquittal is final, ending a defendant's jeopardy, and ... is a bar to a subsequent prosecution for the same offence." Green v. United States, 355 U.S. 184, 188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (quotation marks omitted). Acquittals are unreviewable even if they are based on the factfinder's "mistaken understanding of what evidence would suffice to sustain a conviction" or its "misconstruction of the statute." Evans, 568 U.S. at 318.

Although the Defendant relies on McElrath in arguing that double jeopardy precludes a retrial in this case, in our view, McElrath does not control because the jury in that case indisputably acquitted the defendant of the murder charge, and the trial judge entered a judgment of acquittal on that count. See State ex rel. Anderson v. Preyer, No. SD 38672, 2025 WL 2437529, at *7 (Mo. Ct. App. Aug. 25, 2025) (distinguishing McElrath in a case where trial judge overlooked the ambiguity in the verdict form and discharged the jury without correction). In addition, the inconsistency in McElrath resulted from the jury's verdicts on different counts that arose from the same facts, not directly contradictory and ambiguous verdicts on the same counts as we have in this case. The holding in McElrath extended no further than to recognize that the U.S. Constitution does not permit appellate review of an acquittal. Id. (citing McElrath, 601 U.S. at 98, 144 S. Ct. 651 (Alito, J., concurring)).

Given the above law, we cannot say that the jury's ambiguous verdict was valid and final for the following reasons. First, we conclude that the trial court's acceptance of the improper verdict forms was not the functional equivalent of an acquittal. In open court, the jury announced that the Defendant was guilty of aggravated child abuse, aggravated child neglect, and two counts of reckless homicide, and it did not pronounce an acquittal of the Defendant. See United States v. Merlino, 310 F.3d 137, 142 (3d Cir. 2002) (for an acquittal to bar future litigation, it must be unanimous and a "hung jury" does not bar future prosecutions). In open court, the trial court accepted the collective verdict of the jury finding the Defendant guilty of the greater offenses of aggravated child abuse and aggravated child neglect and two counts of reckless homicide. Although the verdict forms

marked not guilty for the lesser included offenses, at most, this represents disagreement as to the verdict and the Defendant cannot establish that the jury unanimously and indisputably acquitted him of the lesser included offenses. Because the verdict forms neither convicted nor acquitted the Defendant in this case, the jury's verdict did not conclusively establish that the Defendant was criminally liable for the offenses charged. As such, their verdicts were not final and did not terminate the initial jeopardy or foreclose future prosecution of the offenses of conviction. We therefore reject the Defendant's argument that if he is retried, he will be placed in double jeopardy because the verdict forms were ambiguous. We conclude that the appropriate remedy in this case is a remand for a retrial on the offenses of conviction, beginning with reckless homicide in counts 1 and 2, aggravated child abuse in count 3 and aggravated child neglect in count 4.[3] The jury instructions should also include an acquittal first order of consideration listing all lesser included offenses for these 4 felonies.

**II. Thirteenth Juror**. In his motion for new trial, the Defendant specifically asserted that "[a]ny verdict of guilt would be against the weight of the evidence." Although the trial court denied the Defendant's motion for a new trial by order and orally rejected the Defendant's claim that the weight of the evidence was insufficient, in doing so, the trial court invoked the sufficiency-of-the-evidence standard of review under Jackson v. Virginia, 443 U.S. 307, 319 (1979). Consequently, the Defendant argues that the trial court failed to fulfill its duty as the thirteenth juror because, rather than independently reweighing the evidence presented at trial, it applied a sufficiency-of-evidence standard of review in denying his motion for a new trial. By wrongly deferring to the jury, the Defendant submits that the trial court failed to fulfill its duty as the thirteenth juror, which justifies a new trial.

---

[3] In a thoughtful separate opinion, the dissent asserts that the State should be able to proceed with the original charges set forth in the indictments. In adopting that remedy, this court would be disregarding the jury's not guilty determinations as to First-Degree Felony Murder by the Commission of Aggravated Child Abuse and Second-Degree Murder for Count 1 and First-Degree Felony Murder by Aggravated Child Neglect and Second-Degree Murder for Count 2.

The dissent reasons that there are direct contradictions that support doing precisely that. There are, however, no inherent legal contradictions in the jury's verdict regarding the jury's not guilty findings as to First-Degree Felony Murder by the Commission of Aggravated Child Abuse and Second-Degree Murder for Count 1 and First-Degree Felony Murder by Aggravated Child Neglect and Second-Degree Murder for Count 2. Furthermore, there is no legal contradiction between an acquittal on the greater offenses and either an acquittal or a conviction on the lesser offenses. For example, with regard to Count 1, an acquittal on the first-degree murder charge is consistent with both a conviction for reckless homicide and an acquittal for criminally negligent homicide. That a jury simultaneously concluded that the Defendant was guilty and not guilty of lesser included offenses does not legally contradict the jury's determination that the Defendant is not guilty of the greater offenses. Accordingly, we are of the view that the jury's consideration should begin, as delineated above, with reckless homicide in counts 1 and 2, aggravated child abuse in count 3, and aggravated child neglect in count 4.

In response, the State concedes that the trial court did not expressly approve the jury's verdicts as the thirteenth juror at the end of trial. The State nevertheless contends that the trial court fulfilled its role as the thirteenth juror and that a single citation error to Jackson does not warrant a new trial. The State points out that the trial court separately addressed the Defendant's sufficiency argument in its oral and written findings, which demonstrates that the court understood its role. Finally, the State argues that the trial court's finding at sentencing that the Defendant treated the victim with "exceptional cruelty" confirms that the court was convinced of the Defendant's guilt. See e.g., State v. Williams, No. M2009-01739-CCA-R3-CD, 2010 WL 4674300, at *8 (Tenn. Crim. App. Nov. 17, 2010) (considering the trial court's comments in denying the defendant's thirteenth juror motion, the courts comments immediately before sentencing, and the courts comments at the motion for new trial and concluding that the trial court failed to fulfill its duty as thirteenth juror) (citing State v. Miller, No. W2000-01306-CCA-R3-DC, 2002 WL 1482788, at *8 (Tenn. Crim. App Feb. 14, 2002) (rejecting defendant's claim that certain statements by the trial court at sentencing and motion for new trial demonstrate trial court's failure to fulfill its duty as the thirteenth juror), no. perm. app. filed and State v. Ayers, No. E2000-03074-CCA-R3-CD, 2001 WL 1328533, at *3 (Tenn. Crim. App. Oct. 29, 2001) (where record did not indicate trial court exercised its affirmative duty to act as thirteenth juror, observing that "the tone and content of the comments of the trial court at sentencing signal a satisfaction with the verdict"), no perm. app. filed. Because the record affirmatively shows that the trial court believed the weight of the evidence supported the jury's verdict, the State submits there is no reason to grant a new trial. For the reasons that follow, we agree with the Defendant, and conclude that the Defendant's convictions must be reversed, vacated, and remanded for a new trial. See also Tenn. Code Ann. § 40-18-119 (noting that "immediately upon the original trial judge dismissing a jury following the return of a unanimous verdict, there is created a presumption that the original trial judge has served as the thirteenth juror and approved the jury's verdict with respect to each count on which a unanimous verdict was returned").

Rule 33(d) of the Tennessee Rules of Criminal Procedure provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). This rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) requires that "[t]he trial judge must be personally satisfied with the verdict." State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995). "The purpose of the thirteenth juror rule is

to be a 'safeguard . . . against a miscarriage of justice by the jury.'" State v. Price, 46 S.W.3d 785, 823 (Tenn. Crim. App. 2000) (quoting State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995)).  The rationale behind the rule is that "[i]mmediately after the trial, the trial court judge is in the same position as the jury to evaluate the credibility of witnesses and assess the weight of the evidence, based upon the live trial proceedings."  Moats, 906 S.W.2d at 434.

An appellate court "'may presume that the trial court approved the verdict as the thirteenth juror' when it has overruled a motion for new trial without comment."  State v. Leath, 461 S.W.3d 73, 115 (Tenn. Crim. App. 2013) (quoting State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006)).  It is only when "the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duties as the thirteenth juror.  Carter, 896 S.W.2d at 122; see also State v. Matthews, No. M2009-00692-CCA-R3-CD, 2010 WL 3210499, at *4 (Tenn. Crim. App. Aug. 13, 2010) (remanding the case for a new trial because the comments of the trial court "indicated that he simply deferred to the jury result in deciding to overrule the motion for new trial").  Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Tennessee Rule of Appellate Procedure 13(e).  State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993).  If the reviewing court concludes that the trial court failed to fulfill its duty as the thirteenth juror, the sole remedy is to grant a new trial.  Moats, 906 S.W.2d at 435 (noting that an appellate court is ill-suited to assess whether the verdict is supported by the weight and credibility of evidence).[4]

An inquiry into the weight of the evidence is entirely different [from an assessment of the sufficiency of the evidence].  State v. Ellis, 453 S.W.3d 889, 899 (Tenn. 2015).  In Ellis, the Tennessee Supreme Court reiterated that Rule 33 is in stark contrast to Tennessee Rule of Criminal Procedure 29, which requires a trial court to "order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is *insufficient* to sustain a conviction of such offense or offenses."  Id. at 898 (quoting Tenn. R. Crim. P. 29(b)

---

[4] In civil cases, if a trial court fails to fulfill its role as the thirteenth juror by applying an incorrect standard or misconceiving its role, appellate courts no longer automatically remand for a new trial. See Fam. Tr. Servs. LLC v. Green Wise Homes LLC, 693 S.W.3d 284, 290 (Tenn. 2024).  Instead, the case is remanded to the trial court to determine whether it can fulfill its role as the thirteenth juror under the correct standard. In a footnote in its brief, the State preserves its position that the automatic reversal rule under Moats should be reversed in criminal cases.

- 49 -

(emphasis in original)). The Court explained the distinction between assessing the weight of the evidence and assessing the sufficiency of the evidence as follows:

> The distinction between the weight and the legal sufficiency of the evidence is one that our law has always recognized. Different considerations are present in each. In evaluating the legal sufficiency of the evidence, the judge determines whether all the necessary elements of the offense have been made out, whether the defendant's identity has been established and whether the proof demonstrates the existence of a valid defense. In doing so, the court is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn from the evidence. . . .
>
> An inquiry into the weight of the evidence is entirely different. The trial judge does not have to view the evidence in the light most favorable to the prosecution; he may weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses and the preponderance of the evidence. As the Eighth Circuit stated in United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980), even if the trial judge concludes that "despite the abstract sufficiency of the evidence to sustain the verdict, [that] the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [he] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Id. at 1319.

Ellis, 453 S.W.3d at 899. Finally, the advisory commission comments to Rule 33 caution that "[o]ne should distinguish a new trial granted because the verdict is against the weight of the evidence from a granted motion for judgment of acquittal under Tenn. R. Crim. P. 29(b) for insufficiency of evidence to convict. In the latter situation, retrying the defendant would result in double jeopardy, while in the former situation it would not." See Advisory Commission Comments to Rule 33(d) (citing Tibbs v. Florida, 457 U.S. 31 (1982)).

At the Defendant's December 14, 2022 sentencing hearing, the State argued that the Defendant's sentence should be enhanced based on enhancement factor (5), that the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. The trial court agreed and made the following comments in support of enhancement factor five:

> I find that this enhancement factor applies as well. It applies along the following line of facts that were developed during the trial: The evidence was that the defendant began internet searches at approximately 8:30:30 in

- 50 -

the morning of "infant CPR," what to do if your child is not breathing," "what to do if your child is turning blue[.]" Searches of that nature. And that may not be the specific - - those may not be the specific searches, but they're close enough that the Court accepts the fact that that injury – the injury that led to the death of the child occurred at about 8:30 in the morning. So we have a five-hour lapse between 8:30 and 1320 when the call came in through 911 communications that the defendant presented the child to the emergency room – the Tennova emergency room. During that period of time, the Court does accept the government's argument that the defendant tried to A, figure out how to come up with a plausible reason for the wounds; and B, tried to conceal the physical nature of the wounds that were inflicted on the child by wrapping him up and by putting a tarp over his car seat. And I find that that's one reason right there to apply the enhancement factor.

The Defendant filed his motion for new trial, asserting that the verdict was against the weight of the evidence. At the August 16, 2023 motion for new trial hearing, the court stated:

[The Defendant] asserts that the verdict is against the great weight of evidence. I'm looking at the Jackson versus Virginia standard, which has been the standard of review on weight of the evidence for 50 years in this country. If there is any credible evidence, supports the evidence from which a jury may infer guilt, then that standard is met. In my estimation, that standard was met in this case.

On September 8, 2023, by written order, the trial court denied the Defendant's motion for new trial and again stated:

[The Defendant] asserts the verdict is against the weight of the evidence. From a review of the evidence and extent of testimony it is clear that the great weight of the evidence supported the jury's verdict. Jackson v. Virginia, 443 U.S. 307 (1979).

As an initial matter, we acknowledge that this court has previously relied upon extraneous comments made at sentencing and the motion for new trial in determining whether the trial court properly discharged its role as the thirteenth juror. Those cases, however, are clearly distinguishable from the instant case because the trial court here expressly invoked the Jackson sufficiency-of-the-evidence standard of review in rejecting the Defendant's challenge to the weight of the evidence. We are also reluctant to rely on the court's sentencing hearing comments because (1) the comments therein predated the Defendant's challenge to the weight of the evidence, and (2) the comments were made in

support of an enhancement factor which is subject to a different standard and not an independent evaluation of the evidence in the case. Even if we were to consider the trial court's comments from the sentencing hearing applying enhancement factor (5), the trial court's thirteenth juror determination would be far from clear and equivocal as required by Moats.

We are unable to conclude, as the State suggests, that this was a mistaken citation error for two reasons. First, it should be noted that in his motion for new trial, the Defendant challenged the sufficiency of the evidence as a separate issue from his challenge that the verdict was against the weight of the evidence. We disagree with the State's assertion that the trial court's consideration of both issues reflects its understanding of its role as the thirteenth juror. Instead, we view the trial court's consideration of both issues as concrete support of its misunderstanding of its role as the thirteenth juror. Notably, in its oral findings denying the motion for new trial, the court employed the same language in rejecting both issues. In rejecting the Defendant's challenge to the sufficiency of the evidence, the court stated, "*If there is any credible admissible evidence from which a jury may infer guilt, then the verdict will be presumed to be correct.*" In rejecting the Defendant's argument that the verdict was against the weight of the evidence, the court again stated, "*If there is any credible admissible evidence, supports the evidence from which a jury may infer guilt, then that standard is met. In my estimation, that standard is met in this case.*"

In its written order denying the Defendant's motion for new trial and addressing the Defendant's challenge to the weight of the evidence, the trial court again specifically cited Jackson v. Virginia, 443 U.S. 307 (1979). At no point in the trial court's oral or written findings did the trial court indicate that it had independently weighed the evidence and assessed the witness's credibility. Dankworth, 919 S.W.2d at 56. Instead, the trial court repeatedly invoked the Jackson sufficiency-of-the-evidence standard of review, which is entirely different than an inquiry into the weight of the evidence. See State v. Larkin, 443 S.W.3d 751 (Tenn. Crim. App. 2013)( "The 13th juror rule, which requires the trial court to independently weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence, requires the trial court to determine for itself whether the evidence adduced at trial establishes guilt beyond a reasonable doubt."). In applying the Jackson sufficiency-of-the-evidence standard of review, we conclude that the trial court misunderstood and failed to discharge its role as the thirteenth juror. Accordingly, as required by law, this court must reverse and vacate each of the Defendant's convictions and remand for a new trial.

**III. Sufficiency.** The Defendant does not challenge his conviction for aggravated child abuse. His sole challenge to the sufficiency of the evidence rests with counts two and four, reckless homicide and aggravated child neglect. He acknowledges that he was

acquitted of first-degree murder in the perpetration of aggravated child neglect and that reckless homicide does not require proof of neglect. However, the Defendant insists it does not make a difference if he was acquitted of the greater offense because the State was required to prove his intent in delaying treatment for the offense of aggravated child abuse. He asserts that aggravated child abuse requires actual injury, and there was no evidence to show that "any quicker treatment would have saved" the victim. Relying on Dr. Betters' testimony that by the time the victim arrived at the hospital, it was too late to place an EVD into the victim's brain, the Defendant argues that it would not have made a difference if the Defendant had gotten the victim to the hospital any sooner. The Defendant insists that Dr. Betters' testimony allowed only for the "possibility that delay might have caused harm" and that such testimony "fails to provide grounds for condemning the accused."

In response, the State contends the Defendant neglected the victim by failing to seek medical treatment immediately after his life-threatening injuries and when the Defendant lied to Mother about taking the victim to the doctor earlier in the day. The State argues that the blunt force trauma caused multiple skull fractures and the delayed medical treatment led to increased brain bleeding, brain swelling, retinal hemorrhages, and other complications. Based on these acts and omissions, the State submits that the Defendant caused serious bodily injury separate and apart from the initial abuse he inflicted upon the victim. Regarding Dr. Betters' testimony, the State asserts that she was asked three questions about how the delay in seeking medical treatment impacted the victim, and the Defendant chose to ignore the entirety of her testimony and focus only on Dr. Betters' answer to the third question. Upon our review, we agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson, 443 U.S. at 319); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct

or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

A person commits the offense of aggravated child neglect who "commits . . . child neglect, as defined in § 39-15-401(b) . . . and . . . [t]he act of . . . neglect . . . results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a)(1) (Supp. 2000). Where the child is eight years of age or less, the offense of aggravated child neglect is a Class A felony. Id. § 39-15-402(b). "Serious bodily injury" is defined as bodily injury involving: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Id. § 39-11-106(34) (Supp. 2000). A person commits child neglect who "knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Id. § 39-15-401(b). Because "the offense of child abuse through neglect is principally a nature-of-conduct offense . . . the State has no burden . . . to show that the defendant intended that his children suffer adverse effects to their health and welfare." State v. Mateyko, 53 S.W.3d 666, 676-77 (Tenn. 2001); State v. Goodwin, No. M2022-00540-CCA-R3-CD, 2023 WL 7324497, at *29-30 (Tenn. Crim. App. Nov. 7, 2023) (rejecting defendant's claim that the evidence was insufficient to support a finding that he knowingly neglected the victim because the victim did not have noticeable injuries and were consistent with typical characteristics of a toddler). "[B]efore a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." Mateyko, 53 S.W.3d at 671-72. "[T]he mere risk of harm is insufficient to support a conviction." Id. at 667.

"[O]ur supreme court has recognized that 'a child is neglected whenever the breach of a legal duty endangers the health or welfare of that child or otherwise places the child's health or welfare at some risk of harm.'" Id. at 671. Consistent with Mateyko, Black's Law Dictionary defines neglect as meaning "to omit, fail, or forbear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention

- 54 -

in doing or omit a given act." *Neglect*, Black's Law Dictionary (6th ed. 1990); Goodwin, 2023 WL 7324497, at *38 ("This court has repeatedly held that the common understanding of 'neglect' is 'to ignore or disregard' or 'to fail to care for or attend to sufficiently or properly."), no perm. app. filed.

In applying the above principles and law to instances where a defendant is convicted of both aggravated child abuse and aggravated child neglect, as in this case, this court has held that there must exist some evidence that the alleged act of neglect resulted in serious bodily injury in addition to and apart from the serious bodily injury caused by the initial act of abuse. See State v. Watkins, No. M2009-02607-CCA-R3CD, 2011 WL 2682173, at *24 (Tenn. Crim. App. July 8, 2011) (collecting cases) (State v. Brock, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *6 (Tenn. Crim. App. Mar. 16, 2011) (holding the evidence was insufficient to support the defendant's convictions for aggravated child neglect because record devoid of evidence that any delay in seeking medical attention caused the victim any injury), no perm. app. filed; State v. Raymond, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *14-15 (Tenn. Crim. App. Nov. 10, 2010) (holding evidence of aggravated child neglect to be insufficient where proof did not show that alleged act of neglect-defendant's delay in seeking medical attention-had any harmful effect on the victim's health), no perm. app. filed; State v. Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at * 11 (Tenn. Crim. App. Apr. 26, 2010) (holding insufficient evidence to support aggravated child neglect conviction where evidence showed that initial act of abuse caused serious bodily injury, not delay in seeking medical attention), perm. app. denied (Tenn. Sep. 24, 2010); State v. Wiggins, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *5 (Tenn. Crim. App. Nov. 2, 2007) (holding insufficient proof presented to establish that act of neglect resulted in serious bodily injury), no perm. app. filed.

The Defendant argues that the evidence of child neglect based on the delay in seeking medical treatment in this case was less than the evidence of the same offered in Barlow, 2010 WL 1687772, at *11. We disagree. In Barlow, the State presented the alternative theory that the defendant's failure to seek prompt medical attention for the victim following her injury negatively affected her health because it allowed her brain to continue to swell within her skull, thereby causing further brain damage. The period between the instant that the victim exhibited symptoms and the moment that the defendant left to drive the victim to the hospital was just over an hour to an hour and a half at the most. Expert medical testimony established generally that there is a danger of having increased pressure inside the skull due to swelling of the brain. One expert stated that "time in these injuries is of the essence." He also said that if the medical resident at the hospital had not immediately prepared the victim for surgery and contacted him so quickly, then the victim's "course would have been worse" because "she would have had more swelling." However, he then immediately added, "[Y]ou never know what difference it

- 55 -

would make." In reversing the defendant's conviction of aggravated child neglect, this court concluded that the evidence presented at trial did not establish that the defendant's delay in seeking medical treatment had an "actual, deleterious effect" on the victim's health separate and apart from the initial act of abuse.

Viewing the evidence in the light most favorable to the State, we conclude that, after the initial injury, in this case dropping the victim down the stairs and/or causing blunt force trauma to the victim's skull, the Defendant knowingly neglected the victim by not seeking prompt medical treatment, and that said neglect resulted in serious bodily injury separate and apart from the initial injury suffered by the victim. The record shows that, other than an irritation to his penis, when Mother left for work on the morning of the offense, the physical health of the victim was normal. Mother and the Defendant had agreed that the Defendant would take the victim to the doctor to assess his penis injury that morning. Mother arrived at work at 6:45 a.m. According to the Defendant, roughly one-and-a-half to two hours later, at around 8:30 or 9:00 a.m., he dropped the victim down a set of fourteen stairs, and the victim's head fell toward the baseboard. The Defendant said he picked up the victim, who cried briefly and threw up. The Defendant said he fed the victim, which appeared to soothe him. The Defendant began searching the internet for medical information at 8:32 a.m., and another search occurred at 8:56 a.m. The Defendant visited websites such as healthline.com and infantCPR.com. The Defendant's phone logs showed that on January 4, 2020, the day of the offense, at 2:09 in the morning, there was a search for healthline.com. At 8:32 in the morning, there is a Bing search for infantCPR.com, at 8:40 topregisterednurse.com, 8:41 healthline.com. The Defendant said the victim tried to go to sleep, but the Defendant would not allow him to "continuously sleep."

For nearly five hours, the Defendant failed to seek medical treatment for the victim. At 9:36 a.m., the Defendant sent Mother a false text message implying that he was at the doctor with the victim and that they were about to be "released" and "head that way." Although there was a dispute about when the Defendant lied to Mother about taking the victim to the doctor, whether it was when he was at home or when he picked Mother up from work as she entered the car, the Defendant admitted that he lied to Mother about taking the victim to the doctor because he did not want to cause her anxiety while at work. He drove to pick up Mother from work around 10:00 a.m., but she was unable to leave at that time. The Defendant returned home, and he went to pick up Mother from work a second time around 11:00 a.m. He placed the victim in the back of the car in his car seat. The Defendant picked up Mother from work and proceeded to Walmart, where he stayed with the victim, his older stepson, and Mother for approximately 45 minutes to an hour. The victim was covered in the car seat the majority of the time while at Walmart. When they arrived home, Mother took the victim out of the car seat and immediately observed that something was wrong with him. They took the victim to the hospital and arrived around 1:24 p.m.

Unlike Barlow, the evidence established that from the time of the victim's initial abuse and injury to the time the Defendant took the victim to the emergency room, there was approximately a five-hour delay in seeking medical treatment for the victim. Although the Defendant argues that he did not knowingly delay medical treatment because the victim did not display any external signs of injury, the victim immediately threw up and repeatedly tried to sleep after the fall. Dr. Betters testified that these were symptoms consistent with severe brain injury that the Defendant chose to ignore. In addition, rather than general testimony regarding the impact of delaying treatment for brain injuries in Barlow, there was substantial and specific expert testimony regarding how the five-hour delay in seeking medical treatment caused the victim additional harm. First, Dr. Giles, the emergency treating physician at Tennova, said that it was evident that the delay from injury to treatment in this case was a red flag for neglect or abuse. Next, the Defendant relied upon only part of Dr. Betters' testimony in arguing that it would not have made a difference if the victim had received medical treatment sooner. When asked if the delay in treatment of several hours after the incident was alleged to have occurred contributed to the victim's death, Dr. Betters said,

> Yes, because by the time [the victim] got to us, his brain swelling was so severe that it was already pushing his brain down into places it shouldn't be and causing damage. His pupils, the black part of his eyes, weren't even reactive to light anymore, and that means that the pressure was so high that it had injured the nerves of his eyes already, so his swelling was so sever, and whenever you have brain swelling from bleeding and it gets severe, it pushes the blood out of your brain, so he wasn't getting good blood flow to his brain tissues, and it was causing more damage, so time is really important with an injury like this.

Dr. Betters was asked again, "so every minute, second – I know you can't say if he would have been there immediately, but it did contribute, correct?" She stated, "Yes, and the neurosurgeons, if the liquid-filled parts of his brain would have been open enough, they could have put a drain in one of those spaces, and then we could have drained off some of the liquid to help with the brain pressures, but everything was too swollen for us to do that." Finally, Dr. Betters was asked, "so if he would have gotten there earlier, that would have been an option?" Dr. Betters said, "It may have been an option." Accordingly, based on the above evidence, we conclude that a reasonable jury could have found that the Defendant's delay in seeking medical treatment for the victim caused injury separate and apart from the initial abuse inflicted by the Defendant. The evidence was sufficient to support the conviction for aggravated child neglect. The Defendant is not entitled to relief.

**IV. McDaniel Hearings**.  Before trial, the Defendant filed a motion for a McDaniel hearing and moved to exclude the testimony of Dr. Erin Carney, the State's forensic pathologist, regarding the specific manner in which the blunt force trauma was delivered. The Defendant argued that Dr. Carney's testimony that the victim had been beaten was speculative, unscientific, and failed to assist the jury in any substantial way.  In addition, the Defendant moved to exclude the testimony of the hospital doctors, concluding that the victim was abused or had a diagnosis of nonaccidental trauma, on the same grounds.  In this appeal, the Defendant contends that the trial court abused its discretion in refusing to conduct a "true" McDaniel hearing before admitting the expert testimony and in failing to consider whether there was an unwarranted analytical gap between the data and the opinions given by the experts.  The Defendant acknowledges that the court allowed the State's witnesses to be voir dired during trial; however, he submits that such a procedure cannot substitute for an actual McDaniel hearing.  The Defendant also argues that the trial court should have excluded the opinions of the State's experts in this case because none of them provided scientific reasoning in support of their conclusions.  In response, the State contends that the trial court reasonably held a McDaniel hearing during trial to accommodate the scheduling availability of the State's four expert witnesses.  The trial court also properly exercised its discretion by admitting expert medical testimony that the victim's injuries were the result of child abuse rather than accidental harm.  This evidence was both relevant and scientifically reliable.  We agree with the State.

Determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an abuse of that discretion.  State v. Davidson, 509 S.W.3d 156, 208 (Tenn. 2016) (citing McDaniel, 955 S.W.2d at 263-64; State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009)).  "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party."  Scott, 275 S.W. 3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Rule 702 of the Tennessee Rules of Evidence, which governs the admissibility of expert testimony, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. The Tennessee Supreme Court has defined the trial court's role in determining the admissibility of expert testimony:

> Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

Scott, 275 S.W.3d at 401-02 (citations and internal quotation marks omitted).

Tennessee Rule of Evidence 703, which concerns the proper bases for opinion testimony by experts, provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703 (Emphasis added).

The trial court, when determining the admissibility of expert testimony, must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to give an opinion within the limits of the witness's expertise. Davidson, 509 S.W.3d at 208; Scott, 275 S.W.3d at 402; State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002). In making this determination, the key factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." Stevens, 78 S.W.3d at 834. In other words, the court must determine whether the witness is an expert in the area in which he or she is providing testimony. Scott, 275 S.W.3d at 402 (citing Tenn. R. Evid. 702).

Next, the trial court must determine whether the basis for the expert's opinion, namely testing, research, studies, or experience-based observations, adequately supports the expert's conclusions to ensure that there is no significant analytical gap between the opinion and the data upon which the opinion is based. Id.; Stevens, 78 S.W.3d at 834. The

"connection" between the expert's conclusion and the underlying data supporting the conclusion is especially important when determining the reliability of experience-based testimony because experiences are not easily verified by a court. Stevens, 78 S.W.3d at 834. Nevertheless, a trial court may make a finding of reliability in such cases "if the expert's conclusions are sufficiently straightforward and supported by a 'rational explanation which reasonable [persons] could accept as more correct than not correct.'" Id. (quoting Wood v. Stihl, 705 F.2d 1101, 1107-08 (9th Cir. 1983)).

Courts should also consider the methodological and foundational reliability of the expert's testimony. Scott, 275 S.W.3d at 403. When evaluating the reliability of an expert's testimony, the trial court may consider the following non-exclusive factors:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

McDaniel, 955 S.W.2d at 265 (citing Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)). Rigid application of the McDaniel factors is not required. Id. at 277. This court has observed that

> [t]he reasonableness of the McDaniel factors in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. The McDaniel factors may apply, subject to the trial court's discretion, when they are reasonable measures of the reliability of the expert testimony.

State v. Copeland, 226 S.W.3d 287, 302 (Tenn. 2007) (internal citations omitted).

The Defendant's initial complaint is that the trial court abused its discretion in holding a McDaniel hearing during trial rather than before trial. However, there is no rule requiring a pre-trial McDaniel hearing. Additionally, Tennessee courts have routinely conducted McDaniel hearings during trial. Cornwell v. State, No. E2016-00236-CCA-R3-PC, 2017 WL 5957667, at *21 (Tenn. Crim. App. Dec. 1, 2017); State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009) ("The abuse of discretion standard applies regardless of whether the ruling was made during pre-trial proceedings or during the trial itself."). The record shows that the trial court was attempting to accommodate the schedule of multiple medical experts, one of whom had been scheduled to testify in other criminal matters. Accordingly,

we conclude that the Defendant has failed to demonstrate that the trial court's decision to conduct the hearing during trial was improper.

Next, the Defendant complains that the trial court failed to address whether an analytical gap existed between the data upon which the States's witnesses relied, and the opinions the State's witnesses offered. The Defendant does not challenge the qualifications of the State's experts, nor their competency to testify at trial. The Defendant's argument is twofold: (1) that the trial court failed to evaluate the validity of the science of non-accidental trauma/ child abuse, and (2) that, in doing so, the trial court focused solely on the credentials of the witnesses and based its ruling on the "ipse dixit" of the State's experts. We disagree.

The concept of an "analytical gap" refers to the disconnect that may exist between the data or methodology relied upon by an expert and the opinion offered by the expert. If the trial court determines that there is too great an analytical gap between the data and the opinion offered, then the expert opinion may be excluded as unreliable under Rule 702. See Scott, 275 S.W.3d at 402-03 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 144-46, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Examples of when an analytical gap between the data relied upon and the opinion offered include when an expert unreliably applies otherwise sound principles and methodologies, when an expert's opinion is based on assumed facts that vary materially from the facts in the record, or when the expert's opinion is based on tests or data that are flawed and do not support the conclusions reached. See e.g. Gharda USA, Inc. v. Control Sols., Inc., 464 S.W.3d 338, 349 (Tex. 2015) (internal citations omitted). Importantly, the Defendant does not identify how the expert witness opinions in this case were unreliable, nor does he point out any disconnect or analytical gap between the data or methodology relied upon by the experts and the opinions offered in this case. Instead, he generally complains about the trial court's comments focusing on the expert's credentials rather than the validity of the science of "child abuse/nonaccidental trauma/pediatric critical care/forensic pathology" itself.

Although the trial court did not expressly make a reliability determination or analyze the McDaniel factors and the fit between the data upon which the State's witnesses relied and its connection to the opinions offered, the record supports the determination of the trial court in allowing the State's witnesses to testify as experts in this case. During voir dire, each of the State's witnesses were cross-examined in detail regarding their professional qualifications, their methodology, and the factual and scientific basis for their opinions. Defense counsel subjected each of the State's expert witnesses to rigorous cross-examination and tested the connection between data upon which they relied and the conclusions drawn therefrom. Each witness testified from their professional background and experience as well as their examination of the victim. Even though the Defendant insists the science relied upon by the State's witnesses was speculative as "pseudo-

science," Tennessee courts have consistently accepted expert testimony regarding child abuse and accidental versus non-accidental trauma. See State v. Iceman, No. M2016-00975-CCA-R3-CD, 2017 WL 4805118, at *25 (Tenn. Crim. App. Oct. 24, 2017) (quoting State v. Jones, No. W2013-00881-CCA-R3-CD, 2014 WL 3778511, at *15 (Tenn. Crim. App. July 31, 2014) (approving testimony by expert in the field of child abuse pediatrics focusing on the physical injuries of the child victim and how they were caused) (citing State v. Urbano-Uriostegui, No. M2012-00235-CCA-R3-CD, 2013 WL 1896931, at *6, *14-15 (Tenn. Crim. App. May 6, 2013); State v. Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *3-5 (Tenn. Crim. App. Apr. 26, 2010); State v. Maze, No. M2004-02091-CCA-R3-CD, 2006 WL 1132083, at *3-6 (Tenn. Crim. App. Apr. 28, 2006); State v. Davis, No. M2002-02375-CCA-R3-CD, 2004 WL 1562544, at *6-7, *13-15 (Tenn. Crim. App. July 9, 2004); Futrell v. Commonwealth, 471 S.W.3d 258, 286 (Ky. 2015) (finding no abuse discretion under Daubert criteria by allowing expert to opine that the injuries suffered by the victim were inflicted and not accidental-that the child had been violently shaken or that his head had either been slammed against a hard surface or forcibly struck with a hard, blunt object); Wolfe v. State, 509 S.W.3d 325, 334-41 (Tex. Crim. App. 2017) (holding that opinion testimony of State's three experts on subject of abusive head trauma and whether victim's injuries were caused by intentionally inflicted impact was sufficiently reliable to be admissible); State v. Richard W. Gaver, No. 2015CA00204, 2016-Ohio-7055, 2016 WL 5610107, at *4-8 (Ohio Ct. App. Sept. 26, 2016) (finding no "legitimate concern of scientific invalidity" regarding expert's shaken-baby syndrome diagnosis, noting that "[t]his was not the type of junk science that lacked the intellectual rigor required for the admission of expert opinion")).

Accordingly, based on our review of the record, we conclude that there was no gap between the data or methodology relied upon by the State's expert witnesses and the opinions offered in this case. Because each of the State's experts' testimony substantially assisted the jury in determining a fact in issue, namely whether the victim died as a result of nonaccidental trauma, we conclude that the trial court acted within its discretion in allowing the State's witnesses to testify as experts. See State v. Gardner, 716 S.W.3d 388, 416 (Tenn. Crim. App. 2024). The Defendant is not entitled to relief on this issue.

**V. Admissibility of Callous Demeanor Testimony.** The Defendant argues that the trial court abused its discretion in admitting repeated testimony regarding his demeanor because it was not relevant, inflammatory, and "basically a smear against" him. In response, the State contends the trial court properly exercised its discretion in admitting testimony about the Defendant's emotionless demeanor. We agree with the State and conclude without elaboration that the trial court properly admitted this evidence. See State v. Torres, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *39 (Tenn. Crim. App. Mar. 13, 2001), aff'd in part, rev'd in part, 82 S.W.3d 236 (Tenn. 2002) (rejecting the defendant's Rule 402, 403 challenge and concluding that his behavior at the hospital,

including his demeanor, reflected a deficit in the defendant's concern for his son and in his efforts to ensure his son's receipt of proper medical assistance, a deficit that was inconsistent with his simultaneous claims of accidental injury from which the jury could reasonably infer a consciousness of guilt).

**VI. <u>Motion to Suppress.</u>** The Defendant argues the trial court should have suppressed the phone data. He insists the affidavit for the search warrant failed to establish probable cause that the phone would contain any evidence, that it was purely conclusory, and that it gave no factual or detailed basis of knowledge for the officer's conclusions. The Defendant contends the affidavit was unconstitutional because it failed to list any evidence tying the purported crime to the phone. He argues that this error was not harmless because it showed the injury occurred a number of hours before the trip to the hospital and visits to websites suggesting that he knew the victim was seriously injured. In his reply brief, the Defendant counters the State's brief and argues that the trial judge had no authority to modify the order to include the issue of standing. He insists that the State's failure to raise the affirmative defense of standing below precludes them from relying on this ground on appeal because it is waived. Finally, the Defendant argues that the trial court could not "infer probable cause simply because the police officer was intimately familiar with the case and after investigating, the officer expected to find evidence on the phone" because <u>Nathanson v. United States</u> mandates that a knowledgeable officer's "cause to suspect" and "actual belief" is insufficient. 290 U.S. 41 (1933)

In response, the State contends that the trial court properly denied the motion to suppress and that any error in the admission of the phone data was harmless. The State argues the magistrate could have reasonably inferred that the Defendant's cell phone contained incriminating evidence including text message and call log information based on allegation that Mother met with investigators and "agreed to hand over evidence of the alleged crime which was to include [the Defendant's] cell phone." According to the affidavit, Mother turned over the phone that day, and "it was believed to be used to message and make phone calls on or about the time the alleged murder took place." The State submits it was reasonable to infer, based on these allegations, that Mother told investigators about her text messages and phone calls with the Defendant on January 4, 2020. The State also concedes that the trial court impermissibly modified the suppression order and urges this court to remand for a hearing on the issue of standing should we deem it appropriate. We agree with the State and conclude that the trial court properly denied the motion to suppress.

On January 29, 2020, a search warrant was issued for the cellular phones of the Defendant and his wife. The affidavit in support of the warrant alleged as follows:

Your Affiant, Investigator Jamie Norris of the Manchester Police Department makes this affidavit. Your Affiant has worked in the field of law enforcement for approximately 7 years and have been an Investigator with the Manchester Police Department for less than 1 year. I have been to numerous schools and classes relating to working homicides, crime scenes, detection and investigation of illegal narcotics violations, including the possession and manufacturing of methamphetamine and numerous marijuana investigations. I have made numerous arrest that involve violent crimes and drug activity that have resulted in arrest and convictions. I have gained much valuable experience through my years of work in all types of investigations relating to violent crimes and drug offenses such as homicides, aggravated assaults and possession and manufacturing of methamphetamine as well as the distribution of methamphetamine and other illegal narcotics. Your Affiant testifies that the information contained herein, unless otherwise stated, is based upon personal knowledge or information received from other law enforcement officers and confidential sources that your Affiant believes to be true[.]

The warrant was supported by an additional five pages, which included detailed facts from the investigation and provided, in relevant part, as follows:

Chief Investigator Brandon Tomberlin and I met with the parents of [the victim] prior to going to Vanderbilt Hospital. We met them at their residence, which is described above. It was determined that [the Defendant] had the child while Mother was at work. The Defendant stated that at approximately 0900 hours he was carrying the victim down the stairs and tripped over a toy truck. Furthermore, the Defendant stated that he was carrying the victim in his left arm, with the victim facing away from [the Defendant's] body. [The Defendant] stated that the victim was sitting on his arm with his backside against his chest. [The Defendant] stated that when he tripped over the toy truck, he attempted to grab the railing to the right side of him. [The Defendant] states that the victim fell from his left arm and fell down approximately 8 or 9 steps before coming to rest at the bottom of the staircase. [The Defendant] stated that his other son (3 years old) was at the bottom of the stairs and witnessed the incident. [The Defendant] stated that the victim acted calm but that he did "cry a little bit." [The Defendant] stated that he did give [the victim] a bottle a short time later in which [the victim] did throw it up. The Defendant then picked up Mother at her work . . . and that they proceeded to Walmart to complete their taxes. Once they returned home, Mother had concerns about [the victim's] health and decided to take him to the Tennova-Harton Hospital. After our conversation, [the

Defendant] volunteered to provide me with a written statement. Chief Investigator Tomberlin and I left after our conversation. We then proceeded to Vanderbilt Hospital.

. . . Dr. Betters reported that [the victim] had bruised on his forehead, back of his ears, on his nose and on his penis. Dr. Betters stated that the bruising on the back of his ears was "common with child abuse". . . . In Dr. Better's professional opinion, these noted injuries were not consistent with a fall down carpeted stairs. Furthermore, Dr. Better's stated that these injuries were consistent with abuse.

. . . .

On or around 01.17.2020 members of Coffee County District Attorney's Office including DA's Investigator Billy Cook talked with Mother along with her lawyer . . . . They discussed the active investigation for First Degree Murder against her husband [the Defendant]. During this meeting she agreed to hand over evidence of the alleged crime which was to include [the Defendant's] cell phone . . . . Later that day she presented or had this cell phone delivered to me, Jamie Norris and I took possession of it. The phone has been placed in evidence at the Manchester Police Department since that date. This phone is believed to be used to message and [] phone calls on or about the time the alleged murder took place. Report #202000660 is on file at the police department.

I, Investigator Jamie Norris know from my training, education and the experience of working and investigating many types of crimes particularly the crime of TCA 39-13-202, First Degree Murder, that a person that commits this type of crime will utilize their cel phone for the planning, execution, and furtherance of their crimes. I know that [the Defendant] did possess and own a TCL Tracfone cell phone. I know that this cellphone will need to be examined and analyzed for evidence relating to the crime of TCA 39-13-202, First Degree Murder. I know people that commit these types of crimes will use their cell phone or cellular devices to make calls and/or send text messages before, after and during these crimes. . . . I know that call logs can be helpful in knowing who the perpetrator talked to during or around the time the crime was committed. I know that they will access internet web sites and download files, pictures, and videos of these type crimes.

In its written order denying the motion to suppress, the trial court stated, in relevant part:

- 65 -

The affidavit, which Norris authored is attached to and is part of the application for the search and seizure warrant. It details the facts of the death of the victim and the investigative information which had been gleaned there from. The affidavit further asserts that [the Defendant's] cell phone was turned over to the police by his wife, who was represented by counsel on or around January 9th, 2020. More central to the issue, the affidavit asserts that Norris knows that a person that commits this type of crime will utilize their cell phone for the planning, execution, and furtherance of this crime. I know that [Defendant] did posses or own a TCL Tracfone cell phone. I know that this cell phone will need to be examined and analyzed for evidence relating to the crime of TCA 39-13-2002, first degree murder. I know that people that commit these crimes will use their cell phone or cellular devices to make calls and or send text messages before, after, and during these crimes. I know that cell logs can be helpful in knowing who the perpetrator talked to during or around the time the crime was committed. . . .The entire affidavit,( which is for four pages) lists the history of the investigation, which does establish a sufficient nexus to this particular Defendant, the crime, and the suspected contents of the cell phone to warrant issuance of the search warrant. . . . Given the details of the investigation, it is probable that information sought from the suspects cell phone would aid in investigation of the case. Admissions, who Clark talked, to, the timing of the calls, would all be highly relevant to investigation of the case.

In analyzing this issue, we are guided by the following well-established principles of Fourth Amendment jurisprudence. "The application of the law to the facts found by the trial court . . . is a question of law which this court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). "When reviewing the issuance of a search warrant, this Court must determine whether the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." State v. Hayes, 337 S.W.3d 235, 256 (Tenn. Crim. App. 2010). "This Court may consider only the affidavit in reviewing whether the issuance of a search warrant is based upon probable cause. We may not consider any evidence that was not included in the affidavit but was known by the affiant or provided to or possessed by the issuing magistrate." State v. Smotherman, 201 S.W.3d 657, 661 (Tenn. 2006) (citations omitted). "The magistrate's judgment is entitled to great deference on appeal." Hayes, 337 S.W.3d at 256.

In State v. Tuttle, our supreme court set out the requirements for probable cause in an affidavit for a search warrant, adopting a "totality of the circumstances" test. 515 S.W.3d 282, 307 (Tenn. 2017). Both the United States Constitution and the Tennessee Constitution instruct that a search warrant may not be issued "unless a neutral and detached

magistrate determines that probable cause exists for [its] issuance." Id. at 299 (citing Illinois v. Gates, 462 U.S. 213, 240 (1983); State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998); and State v. Jacumin, 778 S.W.2d 430, 431 (Tenn. 1989), overruled on other grounds); U.S. Const. Amend. IV; Tenn. Const. Art. I, § 7. "Probable cause is more than a mere suspicion but less than absolute certainty." Tuttle, 515 S.W.3d at 299. A showing of probable cause generally requires "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Johnson, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993) (citing Lea v. State, 181 S.W.2d 351, 352 (Tenn. 1944)). "In order to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion may be drawn that the contraband will be found in the place to be searched pursuant to the warrant." State v. Norris, 47 S.W.3d 457, 470 (Tenn. Crim. App. 2000) (citing State v. Longstreet, 619 S.W.2d 97, 99 (Tenn. 1981)).

"To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." State v. Saine, 297 S.W.3d 199, 206 (Tenn. 2009) (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002); State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993)). The Tennessee Supreme Court explained that when determining whether a sufficient nexus has been established, reviewing courts should "consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] ... the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" Saine, 297 S.W.3d at 206 (quoting Reid, 91 S.W.3d at 275). Where the affidavit contains no direct evidence of such a nexus, we must determine "whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. Saine, 297 S.W.3d at 206.

We conclude that the trial court properly denied the motion to suppress. Giving deference to the magistrate, we conclude that it did not err when it determined that the affidavit provided probable cause to support the search warrant. The affidavit provided a sufficient nexus between the first-degree murder based on aggravated child abuse of the victim and a search of the Defendant's cell phone. The affidavit included the investigating officer's experience in working on homicides and provided specific details of the investigation. The investigators met with the victim's parents and determined that the Defendant was in exclusive control of the victim while Mother was at work. The affidavit also included the Defendant's statement that he tripped over a toy, fell down the stairs, and dropped the victim. The investigators determined that the Defendant did not take the victim to the hospital immediately. The investigators determined, contrary to the Defendant's statement, that the victim's injuries were consistent with child abuse. The affidavit included a reference to discussing an active murder investigation with Mother and that Mother had "evidence" of the alleged crime, including the Defendant's phone. Mother turned over the Defendant's phone to the investigators. The affidavit referenced that

- 67 -

investigators believed the Defendant's phone was used to message and make phone calls on or about the time of the murder. Further, the magistrate did not err when it reasonably inferred that there existed probable cause based upon the sufficient nexus between the crime and the Defendant's phone, sufficient to establish probable cause, based upon the investigator's discussions with Mother concerning the investigation. It is reasonable to infer from the investigator's discussions with Mother that the Defendant used his phone before, during, and after the commission of the offense. We conclude that the facts contained in the application for the search warrant established a substantial basis on which the magistrate could conclude that evidence of first-degree murder based on aggravated child abuse/neglect would be found on the Defendant's phone. See State v. McLawhorn, 636 S.W.3d 210, 241 (Tenn. Crim. App. 2020); State v. Archey, No. M2024-00755-CCA-R9-CO, 2025 WL 732673, at *6 (Tenn. Crim. App. Mar. 7, 2025), perm. app. denied (Aug. 7, 2025); Nelson v. State, No. M2022-00375-CCA-R3-PC, 2023 WL 5348789, at *22 (Tenn. Crim. App. Aug. 21, 2023), appeal denied (Feb. 12, 2024). Accordingly, the Defendant is not entitled to relief.

**VII. Prosecutorial Misconduct.** The Defendant argues that the State engaged in improper closing arguments by injecting the prosecutor's personal beliefs, intentionally misstating the evidence, and invoking the need to protect the community. In response, the State contends the trial court did not abuse its discretion in overruling objections to the Defendant's alleged instances of improper closing argument, and it remedied any perceived prejudice by giving a curative instruction. We agree with the State.

The Tennessee Supreme Court has noted that "[c]losing argument is a valuable privilege that should not be unduly restricted." State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn.1978)). In order to be entitled to relief on appeal, the defendant must "show that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

This court has recognized five general categories of prosecutorial misconduct:

- 68 -

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998); State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

We consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

(1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

The Defendant takes issue with the following three comments from the prosecutors' closing argument:

The bruise here. I'm not going to show you autopsy pictures. We have already seen and suffered through those. So we'll –I'm just going to show you these. But you-all saw the pictures; you know what was under some of those bruises. *I submit to you that I don't believe a little toy car or even a big toy truck would cause that bruise.*

Now, during this time he takes Mom to her work. She's the only one working. She has a five-week-old, two other kids, and about 6:30, 6:45, drops her off. And then 8:32 is lots of searches. And, again, folks, those are not searches. Those are just the websites he actually went to . . . .

The other thing I have to say is that if you feel in your heart convicted in this case what to do, stand by yourself if you have to. *And y'all reach a good verdict here and take care of our community.*

The trial court did not abuse its discretion in overruling the Defendant's objections to the prosecutors' statements. The record reflects that the trial court provided an appropriate curative instruction to the jury upon the Defendant's objection. To the extent that the above statements may have been improper, applying the above law, we conclude that the Defendant has failed to establish that they were so inflammatory that they affected the verdict to his detriment. The Defendant is not entitled to relief.

**VIII. Speedy Trial.** The Defendant asserts his right to a speedy trial was violated based on the 33-month delay between his arrest and trial. He argues he suffered prejudice in the form of pretrial incarceration, pretrial anxiety, damage to his reputation, and arguably even the loss of his main exculpatory witness. In response, the State contends the delay was "largely outside the State's control" and based on extensive discovery, two meritless interlocutory appeals filed by the Defendant, and scheduling difficulties due to the COVID-19 pandemic. The State insists the delayed trial did not significantly impair the Defendant's defense. We agree with the State.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial. See U.S. Const. amend VI; Tenn. Const. art. 1, § 9. The right to a speedy trial is also statutorily protected in Tennessee. See T.C.A. § 40-14-101 ("In all criminal prosecutions, the accused is entitled to a speedy trial and to be heard in person and by counsel."). In addition, Rule 48(b) of the Tennessee Rules of Criminal Procedure provides that the court may dismiss the indictment if there is unnecessary delay in bringing a defendant to trial. Tenn. R. Crim. P. 48(b). "The purpose of the speedy trial guarantee is to protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal

charges, and the risk that evidence will be lost or memories diminished." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997) (citing Doggett v. United States, 505 U.S. 647, 654 (1992)).

The constitutional right to a speedy trial is not implicated until there is an arrest or a formal accusation from a grand jury. State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn. 2001) (citing Utley, 956 S.W.2d at 491). When evaluating claims of a speedy trial violation, we apply the four-part balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972); see also State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1977) (adopting the Barker analysis in Tennessee). The Barker factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant because of the delay. Barker, 407 U.S. at 530; Simmons, 54 S.W.3d at 759. "The factors relevant to a speedy trial inquiry are interrelated and depend upon the particular circumstances of each case." Simmons, 54 S.W.3d at 762 (declining to articulate a bright-line rule for speedy trial claims); see also Barker, 407 U.S. at 530 ("A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis."). If a reviewing court concludes that the accused has been denied the right to a speedy trial, the only remedy is reversal of the conviction and dismissal of the indictment. See Barker, 407 U.S. at 522; Bishop, 493 S.W.2d at 83. Determining whether a defendant's right to a speedy trial is a question of law to be determined de novo by a reviewing court. Moon, 644 S.W.3d at 78 (Tenn. 2022).

A. Length of Delay. First, we consider the length of the delay. A post-accusation delay of one year or more is "presumptively prejudicial" and will trigger a speedy trial inquiry. Utley, 956 S.W.2d at 494. "The reasonableness of the length of the delay depends on the complexity of the case." State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). "[D]elay that can be tolerated for 'an ordinary street crime' is generally much less than for a serious, complex felony charge." State v. Easterly, 77 S.W.3d 226, 235 (Tenn. Crim. App. 2001), abrogated by Moon, 644 S.W.3d 72 (Tenn. 2022) (quoting Barker, 407 U.S. at 530-31). However, the presumption that the delay has prejudiced the defendant intensifies over time. Simmons, 54 S.W.3d at 759 (citing Doggett, 505 U.S. at 652; Utley, 956 S.W.2d at 494; Wood, 924 S.W.2d at 346).

Here, the Defendant was arrested on January 5, 2020, and indicted on July 14, 2020. After multiple continuances and two unsuccessful interlocutory appeals filed by the Defendant, the matter proceeded to trial on September 19, 2022. The post-accusation delay of 33 months was sufficient to warrant a speedy trial inquiry. However, the 33-month delay was not necessarily unreasonable when compared to other cases. See Simmons, 54 S.W.3d at 759 (approximate twenty-three-month delay between the return of the indictment and the defendant's arrest was not unreasonable); Wood, 924 S.W.2d at 346 (delay of thirteen years did not violate right to speedy trial); Bishop, 493 S.W.2d at 84-85 (delay of

two years supported defendant's speedy trial claim but "[wa]s not per se extreme"); Barker, 407 U.S. at 533-36 (five-year delay between arrest and trial did not violate right to speedy trial). Moreover, the pretrial delay in this case was not unreasonable given the complexity and seriousness of the matter. The record shows that the trial lasted five days and involved over fifteen witnesses. In our view, we weigh the length of delay against the Defendant, albeit slightly.

B. Reason for Delay. The next factor to consider is the reason for the delay. The reasons for post-accusation delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant; (2) bureaucratic indifference or negligence, including lack of due diligence; (3) delay necessary for the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47; see also Simmons, 54 S.W.3d at 759. Deliberate delay is weighed heavily against the State. Negligent delay is also weighed against the State, but less heavily than intentional delay. Delay necessary for effective prosecution, such as locating a missing witness, is considered valid and not weighed against either party. A delay caused or agreed to by the defendant is weighed against the defendant. Wood, 924 S.W.2d 342, 346-47 (Tenn. 1996); see also Barker, 407 U.S. at 531.

In this case, we conclude that the Defendant was responsible for the majority of the delays. The first notice of continuance reset the January 7, 2020 court date by agreement to January 28, 2020, and the second January 28, 2020 court date was reset by agreement to February 25, 2020. On June 12, 2020, the Defendant filed an extensive motion to dismiss a bindover order, arguing that it was based on an autopsy report admitted in violation of the Confrontation Clause and without a foundation for expert testimony. On June 23, 2020, the State filed its response. The Defendant subsequently requested records from the Child Advocacy Center, and the Center moved to squash the subpoena. On June 1, 2021, the trial court entered an order granting the motion to squash. In response, the Defendant filed a motion for the trial court to recuse itself on July 14, 2021, which was denied by the trial court by written order on August 17, 2021. On July 2, 2021, the Defendant filed a Rule 10 motion appealing the trial court's order quashing the subpoena. This court denied the Rule 10 motion on July 13, 2021. On July 14, 2021, the Defendant filed a Rule 10 interlocutory appeal of the trial court's August 2021 denial of his motion to recuse, which this court denied on September 15, 2021. On September 29, 2021, the trial court set the matter for trial on May 17, 2022, and required the parties to exchange reciprocal discovery and disclose their expert witnesses by March 16, 2022. On March 17, 2022, the Defendant filed a "Motion to exclude, or at minimum, narrow, the Defendant's recorded statements to be admitted at trial." On March 17, 2022, the Defendant filed a motion to dismiss the indictment based on a violation of the Sixth Amendment right to a speedy trial.

On March 29, 2022, the State filed a motion to continue the trial scheduled for May 17, 2022. As grounds, the State attached an affidavit of the assistant district attorney averring that the State had consulted with four separate experts as to the injuries sustained by the victim, and that these experts agreed that the victim suffered non-accidental trauma that resulted in his death and that the father's explanation of the victim's injuries is inconsistent with their medical findings. The motion also asserted that the defense had retained Dr. John C. Hunsaker, III, to testify, and anticipated that he would disagree with the four State experts. The motion provided that, as of this date, the State had not received a report from Dr. Hunsaker. On May 23, 2022, the trial court entered an order resetting the trial set for May 17, 2022, to September 19, 2022. On August 31, 2022, the Defendant filed an amended motion to dismiss, arguing that his speedy trial rights had been violated. On September 12, 2022, the State filed a motion seeking an express written waiver of conflicts with defense counsel from the Defendant. This motion concerned a criminal investigation defense counsel was under involving the instant case. The trial court denied the motion, and the case proceeded to trial on September 19, 2022. We conclude that this factor weighs against the Defendant.

C. <u>Assertion of Right.</u> The third factor to evaluate is whether the accused asserted the right to a speedy trial. Assertion of the right weighs strongly in favor of the defendant, while failure to assert the right will make it difficult to prove that the right has been denied. <u>Simmons</u>, 54 S.W.3d at 760 (citing <u>Barker</u>, 407 U.S. at 531-32). Here, the Defendant was incarcerated and unable to make his bond since his arrest on January 5, 2020. Trial counsel filed a notice of appearance on April 30, 2020, and a demand for speedy trial motion on the same day. While we acknowledge the trial court's finding that the COVID-19 pandemic complicated the Defendant's trial, we conclude that the Defendant's assertion weighs in the Defendant's favor, but not heavily.

D. <u>Prejudice from Delay.</u> The final factor, the prejudice to the accused caused by the delay, is the most important to consider in the speedy trial inquiry. <u>Simmons</u>, 54 S.W.3d at 760 (citing <u>Barker</u>, 407 U.S. at 532; <u>Wood</u>, 924 S.W.2d at 348; <u>Bishop</u>, 493 S.W.2d at 85). The prejudice factor is assessed in light of the interests that the right to speedy trial is designed to protect. <u>Barker</u>, 407 U.S. at 532 (identifying three interests of the accused: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired."); <u>see also</u> <u>Simmons</u>, 54 S.W.3d at 760 (citing <u>Bishop</u>, 493 S.W.2d at 85). The Tennessee Supreme Court has observed that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense." <u>State v. Berry</u>, 141 S.W.3d 549, 568 (Tenn. 2004) (citing <u>State v. Baker</u>, 614 S.W.2d 352, 356 (Tenn. 1981)); <u>see also</u> <u>Barker</u>, 407 U.S. at 532 ("Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."). "Faded

memories, erosion or loss of potentially exculpatory evidence, and loss of potentially favorable witnesses are all possible results of a lengthy delay." Wood, 924 S.W.2d at 346.

In his brief, the Defendant contends that he was prejudiced because he suffered pretrial incarceration. The Defendant also asserts that he was prejudiced because his older stepson, who he alleged witnessed the Defendant fall down the steps, lost his memory. At the hearing on his speedy trial motion, the Defendant testified that he had been in custody for two years and nine months. While in custody, he had been "locked down" for twenty-two hours a day. He said that he had never been charged with a felony and that the case had taken a toll on his marriage. He had "bad anxiety problems" and got nervous easily. We conclude that the Defendant's pretrial anxiety and incarceration were not unusual or egregious. Tennessee courts have held that "pretrial anxiety and concern are always present to some extent, and thus absent some unusual showing [are] not likely to be determinative in [a] defendant's favor." Moon, 644 S.W.3d at 80. In addition, as argued by the State, the fact that the Defendant's stepson, who was three years old at the time of the offense and six years old at the time of trial, could not remember what occurred on the day of the offense, inured to the Defendant's benefit. The Defendant was able to admit as substantive evidence and play for the jury the video of the statement the stepson gave to the CAC the day after the offense. The Defendant has failed to establish any impairments in his ability to prepare a defense caused by the delay. Accordingly, this factor weighs against the Defendant.

After applying the Barker balancing test, we conclude that the Defendant's right to a speedy trial was not violated. Accordingly, the Defendant has failed to establish a speedy trial violation, and the trial court did not abuse its discretion in denying the Defendant's motion to dismiss.

**IX.** **Cumulative Error.** Based on our disposition of the Defendant's issues I and II, it is unnecessary to undergo a cumulative error analysis.

## CONCLUSION

In the event of further appellate review, we separately note our conclusions and remedies for the issues involving reversible error in this case. Upon review, we conclude that the verdicts returned by the jury in this case were ambiguous because they purport to simultaneously convict and acquit the Defendant. As such, the verdicts are unenforceable and cannot be given full effect. Regarding the ambiguous verdict issue, our remedy is to reverse, vacate, and remand for a new trial in counts one and two on the offense of reckless homicide, and in counts three and four for the offenses of aggravated child abuse and aggravated child neglect. We also reverse and vacate the Defendant's convictions because the trial court failed to fulfill its duty as the thirteenth juror. As to this issue, our remedy

is a remand for a new trial on first-degree felony murder by aggravated child abuse (count one), first-degree felony murder by child neglect (count two), aggravated child abuse (count three), and aggravated child neglect (count four).


s/                    Camille                    R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE